570 S.E.2d 155

RICK'S AMUSEMENT, INC., B & B Amusement, Tripp's Amusement Company, Fascination of S.C., Britt's Inc. d/b/a Tripp's Convenience, Crenshaw Technology, Inc., Southern Amusements, Ballard Amusements, Inc., Wilkinson Fuel Company d/b/a Nu–Way Marketing, Greenwood Music Co., Inc., McDonalds Amusements, Inc., Cherokee Trail, Sonoco Amusements, and JSW Amusement, and all those similarly situated, Plaintiffs,

of whom Rick's Amusements, Inc., B & B Amusement, Tripp's Amusement Company, Fascination of S.C., Britt's Inc. d/b/a Tripp's Convenience, Crenshaw Technology, Inc., Southern Amusements, Ballard Amusements, Inc., Wilkinson Fuel Company d/b/a Nu–Way Marketing, Greenwood Music Co., Inc., McDonalds Amusements, Inc., Cherokee Trail, Sonoco Amusements, and JSW Amusement are, Appellants,

v.

STATE of South Carolina, Respondent.

and

Leslie Mart, Inc., and all those similarly situated, Plaintiff,

of whom Leslie Mart, Inc., is Appellant,

v.

State of South Carolina, Respondent.

No. 25359.

Supreme Court of South Carolina.

Heard June 6, 2001.

Decided Nov. 5, 2001.

A. Camden Lewis and Ariail E. King of Lewis Babcock & Hawkins, L.L.P., and Richard A. Harpootlian of Richard A. Harpootlian, P.A., of Columbia, for appellants.

Ronald K. Wray, II, and Denise L. Bessellieu, of Gallivan, White & Boyd, P.A., of Greenville, and Nathan Kaminiski, Jr., and Christie N. Barrett, of Office of Attorney General, of Columbia, for respondent.

JUSTICE BURNETT:

Appellants, owners of video gaming machines and operators of commercial establishments providing video gaming machines, appeal the circuit court's order granting Respondent State of South Carolina's (the State's) Rule 12(b)(6), SCRCP, motion to dismiss. We affirm.

## BACKGROUND

In July 1993, the legislature enacted South Carolina Code Ann. § 12–21–2806 (2000) (local option law) which permitted counties to hold a referendum to determine whether non-machine cash payouts for video gaming should become illegal. As a result of the referendum held in November 1994, twelve counties voted in favor of making payouts illegal. Two years later, the local option law was struck down as unconstitutional

special legislation. *Martin v. Condon,* 324 S.C. 183, 478 S.E.2d 272 (1996).

Appellants brought these actions against the State to recover losses allegedly incurred by the local option law and the resulting cash payout ban.[1] Appellants claimed they entered into contracts for the placement of video gaming machines prior to enactment of the local option law and that the law illegally "revoked and/or impounded [their] contracts," constituting a taking without just compensation and an unconstitutional impairment of their contracts.[2]

Relying exclusively on *Mibbs, Inc. v. South Carolina Dep't of Revenue,* 337 S.C. 601, 524 S.E.2d 626 (1999), the trial judge determined because future regulations were foreseeable in the highly regulated video poker industry, appellants failed to state a takings claim or contract impairment claim. The trial judge granted the State's Rule 12(b)(6), SCRCP, motion to dismiss.

## ISSUES

I. Did the trial judge err by granting the State's motion to dismiss appellants' takings claim without conducting the three-prong *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), test? II. Did the trial judge err by granting the State's motion to dismiss appellants' impairment of contract claim?

## DISCUSSION

### I. Takings Claim

■ Appellants argue the trial judge erred by failing to evaluate their takings claim under the standard three-prong takings analysis rather than simply ruling highly regulated industries are precluded from establishing a takings claim.

---

1. Appellants are located in the twelve counties where cash payouts were banned.

2. Appellant Leslie Mart asserted its contract provided for a term beginning on December 6, 1991, with an automatic renewal of another five year term after the first five years. The other appellants asserted they "entered into valid, enforceable contracts ... prior to the enactment or notice of the provisions of Section 12–21–2806."

Appellants rely solely on *Maritrans, Inc. v. United States,* 40 Fed. Cl. 790 (1998). We disagree.

■■■ The Takings Clause of the Fifth Amendment to the United States Constitution provides: "[N]or shall private property be taken for public use, without just compensation." Economic regulation may effect a taking. *Eastern Enterprises v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998); *see Pennsylvania Coal v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (regulation may result in a taking if it goes "too far."). In determining whether governmental regulation violates the Takings Clause, the Court will consider (1) the economic impact of the regulation, (2) its interference with "distinct" investment-backed expectations, and (3) the character of the governmental action. *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). More recent cases describe the second factor as the degree of interference with "reasonable" investment-backed expectations. *Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Westside Quik Shop, Inc. v. Stewart,* 341 S.C. 297, 534 S.E.2d 270, *cert. denied* 531 U.S. 1029, 121 S.Ct. 606, 148 L.Ed.2d 518 (2000).

In *Maritrans, Inc. v. United States, supra,* the plaintiffs claimed the federal Oil Pollution Act of 1990 "took" their tankers by requiring them to be retrofitted with double hulls to continue operation or to be phased out of service. The government argued the plaintiffs did not have a property interest for purposes of the Fifth Amendment because the shipping industry is heavily regulated and, because plaintiffs could have anticipated the requirement of double hulls, they had no reasonable investment-backed expectations.

The Federal Claims Court explained the Federal Circuit has adopted a two-tier analysis for takings claims. Initially, the Court "must determine whether the proscribed activity is a stick' in the plaintiff's bundle of property rights." *Id.* at 793 *citing M & J Coal Co. v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir.1995). If the Court finds affirmatively, it then considers the three factors set forth in *Penn Central.*

The *Maritrans* Court discussed *Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed.Cir.1993),[3] which involved the federal government's revocation of import permits for certain assault weapons after the plaintiff had signed contracts with a foreign government to purchase the weapons for resale in this country. The plaintiff claimed its investment-backed reliance on the permits constituted a compensable property interest under the Fifth Amendment. The federal circuit disagreed.

The *Maritrans* Court noted *Mitchell Arms'* analysis concerned whether the interest affected was "totally dependent" upon the government's regulatory power or "inherent" in the plaintiff's ownership rights. *Mitchell Arms* found the "expectation of selling the assault rifles in domestic commerce—the interest affected in this case—was not inherent in its ownership of the rifles. Rather, it was totally *dependent* upon the import permits issued by the ATF." *Maritrans, supra* at 795, citing *Mitchell Arms, supra* at 217. Accordingly, the *Maritrans* Court concluded the heavily regulated nature of an industry does not preclude a cognizable Fifth Amendment property interest. It stated:

> We cannot find support for the proposition that the mere presence of regulation precludes analysis of the three familiar *Penn Central* factors at the second tier of analysis mentioned by *M & J Coal.*
>
> Establishing a taking claim in certain spheres of activity may be difficult. But we are not aware of a blanket no-takings rule with respect to regulated industries; or that one may never prevail on a takings claim if participating in a heavily regulated industry. Certainly we cannot accept the Government's argument that because the industry in which Maritrans participates is regulated, we should end the inquiry at the first tier of analysis. The Government's argument in this respect is without merit.

*Maritrans, Inc. v. United States, supra,* at 797.

Ultimately, the *Maritrans* Court determined that, although the shipping industry is heavily regulated, the plaintiff's right to ownership of its vessels existed independently of the government's regulatory scheme. Accordingly, Maritrans had a

---

**3.** The Court relied in part on *Mitchell Arms* in *Mibbs, Inc. v. South Carolina Dep't of Revenue, supra.*

property interest in its tankers which could be compensable under the Fifth Amendment.

We agree with appellants that a plaintiff who operates in an heavily regulated industry is not prohibited from establishing the existence of a property interest protected by the Fifth Amendment. The threshold inquiry is whether the property interest affected is inherent in the plaintiff's ownership rights or completely dependent upon regulatory licensing. *Mibbs, Inc. v. South Carolina Dep't of Revenue, supra; see also Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1030, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), *citing Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (the range of interests protected by the Fifth Amendment is defined by "existing rules or understandings that stem from an independent source such as state law."). If the property interest is inherent in the plaintiff's ownership rights, then the Court determines whether a compensatory taking has occurred.

Here, appellants claim the invalid local option law "revoked and/or impounded [their] contracts" for the placement of video gaming machines, thereby constituting a taking. We disagree.

The local option law did not "revoke or impound" appellants' contracts which they entered on the assumption cash payouts would continue to be legal. Appellants' rights to continued cash payouts were completely dependent upon regulatory licensing rather than inherent in appellants' right to own or possess video gaming machines. *Mibbs, Inc. v. South Carolina Dep't of Revenue, supra.* Moreover, their rights to operate video gaming machines were completely dependent upon the regulatory licensing scheme rather than inherent in their right to own or possess the machines. *See* § 12–21–28–8(7) (Supp.1995) (recognizing licensing required for operation of coin-operated devices). Appellants' interest in the contracts did not constitute a property interest which could be compensable as a taking. Accordingly, the trial judge did not err by failing to reach the *Penn Central* factors.

## II.  Impairment of Contract Claim

Appellants assert the trial judge erred by dismissing their Contract Clause claim. They claim that, in spite of the

high degree of regulation of the video poker industry, they could not have foreseen an *illegal* ban on cash payouts. Further, appellants argue that, unlike the video poker operator in *Mibbs, supra,* they entered into contracts before the enactment or notice provisions of the local option law.

Both the United States and South Carolina Constitutions prohibit the State from passing laws which impair the obligations of contracts. *See* U.S. Const. art. I, § 10; S.C. Const. art. I, § 4. A three-step analysis is applied to determine whether a law violates the federal and state Contract Clauses. *Ken Moorhead Oil Co. v. Federated Mutual Ins. Co.,* 323 S.C. 532, 476 S.E.2d 481 (1996). Initially, the Court must determine whether the state law has operated as a substantial impairment of a contractual relationship. If the regulation does constitute a substantial impairment, the State, in justification, must have a significant and legitimate public purpose behind the regulation. Lastly, once a legitimate public purpose has been identified, the Court determines whether the adjustment of contractual rights is based upon reasonable conditions and is of a character appropriate to the public purpose. *Mibbs v. South Carolina Dep't of Revenue, supra.*

In *Mibbs,* the Court addressed this same Contract Clause issue-whether a video poker operator could foresee the passage of the invalid local option law. We held where there is a Contract Clause claim, the threshold inquiry is whether the State law has operated as a substantial impairment of the reasonable expectations of the parties. *Id.* The validity of the regulation is irrelevant to this initial determination. *Id.*

Further, the *Mibbs* Court noted *Martin v. Condon, supra,* struck down the ban on cash payouts because it did not apply statewide, not because the ban was substantively invalid. *Id.* Presumably, the legislature could have banned cash payouts for coin-operated video gaming machines if it did so on a statewide basis.[4]

Finally, the fact that appellants entered into contracts for the placement of video gaming machines before the legislature enacted the local option law is an insignificant distinction from

---

4. At oral argument, appellants conceded the legislature could have banned video gaming altogether.

*Mibbs.* In *Mibbs,* the Court acknowledged there is "no substantial impairment of a contract where the subject of the contract is a highly regulated business whose history makes further regulation foreseeable." *Id.* 337 S.C. at 608, 524 S.E.2d at 629. It concluded the video poker industry was highly regulated and, therefore, further regulation regarding cash payouts was foreseeable. Although recognizing the operator had entered into contracts after enactment of the local option law, *Mibbs* was nonetheless decided on the basis of the high degree of regulation in the video gaming industry.

Appellants assert our decision today will affect the reliability of contracts entered into by participants in other highly regulated fields like banking and insurance. We disagree. Throughout the late 1980s and early 1990s, the same time period during which appellants entered into their contracts, lawmakers repeatedly introduced legislation specifically aimed at eliminating nonmachine cash payouts.[5] In this unique environment, appellants could not have reasonably expected that no regulation would interfere with their anticipated cash payouts. Our ruling does not affect the certainty of contracts in highly regulated fields.

As previously determined in *Mibbs,* the trial judge properly dismissed the impairment of contract claim because appellants could not have reasonably expected cash payouts for coin-operated video gaming machines to remain legal when they entered into the contracts.

**AFFIRMED.**

TOAL, C.J., MOORE, J., and Acting Justices C. VICTOR PYLE, Jr., and THOMAS L. HUGHSTON, Jr., concur.

---

5. *See, e.g.,* H.R. 3823, 108th Leg., 2d Sess. (1989) (bill to repeal S.C.Code Ann. § 16–19–60; H.R. 2867, 108th Leg., 2d Sess. (1989)) (bill to make it unlawful to have or to operate a machine for playing games which utilizes a deck of cards); H.R. 3104, 109th Leg. 1st Sess. (1991) (bill to repeal § 16–19–60).