**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HOLLIDAY AMUSEMENT COMPANY OF
CHARLESTON, INCORPORATED; WARREN
P. HOLLIDAY,
            *Plaintiffs-Appellants,*

v.

SOUTH CAROLINA, State of; GRADY L.
PATTERSON, JR., in his official
capacity as Treasurer of the State of
South Carolina; JIM HODGES,
Governor of South Carolina;
CHARLES M. CONDON, Attorney
General; ROBERT M. STEWART,
individually,
            *Defendants-Appellees.*

No. 06-1668

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
C. Weston Houck, Senior District Judge.
(2:01-cv-00210-CWH)

Argued: May 22, 2007

Decided: July 3, 2007

Before WIDENER, WILKINSON, and KING, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Widener and Judge King joined.

---

**COUNSEL**

**ARGUED:** Roger J. Marzulla, MARZULLA & MARZULLA, Washington, D.C., for Appellants. Robert Holmes Hood, HOOD LAW FIRM, Charleston, South Carolina, for Appellees. **ON BRIEF:** Nancie G. Marzulla, MARZULLA & MARZULLA, Washington, D.C., for Appellants. James B. Hood, Deborah H. Sheffield, HOOD LAW FIRM, Charleston, South Carolina; Henry D. McMaster, South Carolina Attorney General, C. Havird Jones, Jr., Senior Assistant Attorney General, ATTORNEY GENERAL'S OFFICE, Columbia, South Carolina, for Appellees.

---

**OPINION**

WILKINSON, Circuit Judge:

Plaintiffs Warren P. Holliday and Holliday Amusement Company of Charleston, Inc. ("Holliday"), seek just compensation for an alleged regulatory taking. Holliday claims that 1999 S.C. Act No. 125, which outlawed video gaming machines in the state of South Carolina, destroyed Holliday's business and thus effected an unconstitutional taking of his property without just compensation. Holliday brought suit in federal district court, and the court granted summary judgment to the state and its officials. We now affirm.

I.

From 1976 to 2000, Holliday Amusement Co. of Charleston, Inc., a business owned and operated by Warren Holliday, distributed video poker machines in the state of South Carolina. On July 1, 1999, South Carolina enacted 1999 S.C. Act No. 125 (codified at S.C. Code Ann. § 12-21-2710 (2000)), which outlawed the possession of video gaming machines in the state and subjected such machines to forfeiture, effective July 1, 2000.

After the Act was passed and before it went into effect, certain owners and lessees of video gaming machines filed suit in South Carolina court challenging the constitutionality of the Act. *See Westside*

*Quik Shop, Inc. v. Stewart*, 534 S.E.2d 270 (S.C. 2000). They sought an injunction against the Act's enforcement, on the ground that it represented an unconstitutional taking of their property without just compensation. *Id.* at 271. Holliday was not a party to this litigation, although he was a member of the South Carolina Coin Operators Association, which filed an amicus brief. The South Carolina Supreme Court held that Act 125 did not constitute a taking of plaintiffs' video gaming machines, business, or real property and that compensation was thus not required under either the South Carolina or the U.S. Constitution. *Id.* The Act went into effect on July 1, 2000. At that time, Holliday owned 532 operational video poker machines, costing approximately $7000 each.

On January 19, 2001, Holliday brought this action in federal district court, claiming that Act 125 worked a taking of his property, for which he was entitled to just compensation under the Fifth and Fourteenth Amendments. Holliday claimed that, as a result of the Act, his video poker machines (which had been modified to South Carolina specifications such that they could not be used elsewhere) lost all market value, and his business became worthless. Holliday sought compensation for these losses under the Constitution and 42 U.S.C. § 1983.

The district court first granted the state's motion to dismiss for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine. On appeal, this court vacated the district court judgment, because *Rooker-Feldman* only applies to parties to the previous state-court litigation. *See Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 401 F.3d 534, 537 (4th Cir. 2005) (citing *Johnson v. De Grandy*, 512 U.S. 997, 1005-06 (1994)).

Upon remand, the district court granted summary judgment to the defendants. The district court held that, under Supreme Court precedent, no taking had occurred; in addition, it held that plaintiff's claim was collaterally estopped by the *Westside* decision, and that sovereign immunity barred some claims. Holliday appeals.

II.

As an initial matter, we doubt this federal action to be ripe under the requirements of *Williamson County Regional Planning Commis-*

*sion v. Hamilton Bank of Johnson City*, 473 U.S. 172 (1985). *Williamson* set forth "two independent prudential hurdles" to a claim for just compensation for a regulatory taking brought against a state entity in federal court. *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733-34 (1997). First, the property owner must have a final administrative decision regarding the application of the challenged regulations to the property. *Williamson*, 472 U.S. at 186. Second, "if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." *Id.* at 195.

It is the second *Williamson* requirement, the "state procedures requirement," which poses an obstacle here. Plaintiff has not satisfied this requirement because, as he admits, he has not sought just compensation through a state court procedure. In our view, given that South Carolina opens its courts to inverse condemnation claims arising from regulatory takings, *see, e.g.*, *Hardin v. South Carolina Dept. of Transp.*, 641 S.E.2d 437, 441 (S.C. 2007); *Byrd v. City of Hartsville*, 620 S.E.2d 76, 81 (S.C. 2005), the plaintiff was obligated under *Williamson* to avail himself of those procedures.

We recognize, of course, that the state procedures requirement does not apply to facial challenges to the validity of a state regulation. *See San Remo Hotel, L.P. v. City and County of San Francisco*, 545 U.S. 323, 345 (2005); *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005). This case is not a facial challenge, nor is it a challenge to a statute requiring direct transfer of funds to the government. *See Eastern Enters. v. Apfel*, 524 U.S. 498, 521 (1998) (plurality); *see also Washlefske v. Winston*, 234 F.3d 179, 183 (4th Cir. 2000) (suit was ripe where only question to be determined was legality of state program). Rather, it is a regulatory takings case, in which the plaintiff has made clear throughout that he "does not seek to prohibit the taking of his property under Act 125 but, to the contrary, accepts the validity of the governmental action as a prerequisite of maintaining this suit for just compensation." Brief of Appellant at 26, *Holliday*, 401 F.3d 534 (4th Cir. 2005); *see also* Brief of Appellant at 12. Being such a suit, state procedures for the award of just compensation must be utilized.

Plaintiff argues, however, that he is exempt from the state procedures requirement by virtue of the fact that another group of video-gaming operators unsuccessfully asserted a takings claim in *Westside Quik Shop, Inc. v. Stewart*, 534 S.E.2d 270 (S.C. 2000). He further argues that his position is supported by the Supreme Court's decision in *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999), in which, he claims, the Court recognized a "futility" exception to the state procedures requirement.

We conclude, however, that the relevant Supreme Court precedent does not establish an exception to the state procedures requirement in a case such as this. Although the Court has not categorically defined what constitutes an "adequate" state procedure, its cases discussing when a plaintiff might eschew state procedures involve instances where state procedures were not available for plaintiff's claim. In *Williamson* itself, for instance, the Court found plaintiff's claim unripe because the state of Tennessee had available a statutory inverse condemnation scheme which state courts had interpreted "to allow recovery through inverse condemnation where the 'taking' is effected by restrictive zoning laws or development regulations." *Id.* at 196. In contrast, in *Suitum v. Tahoe Regional Planning Agency*, while refraining from deciding the state procedures issue because it was not addressed below, the Court noted that the parties appeared to agree that the defendant local planning agency "d[id] not . . . have provisions for paying just compensation," thus making a federal suit the "sole remedy" for the alleged taking. 520 U.S. at 734 n.8.

Although plaintiff argues that the present case merits an exception under *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999), we do not take that case to say anything different from *Williamson* and *Suitum*, much less to create a new exception broad enough to accommodate the present circumstances. Rather, the situation in *Del Monte Dunes* was of the kind anticipated in *Williamson* itself: in contrast to *Williamson*, where the Court explicitly noted that Tennessee allowed claims for regulatory takings, at the time of the alleged taking in *Del Monte Dunes*, California provided no state-law inverse condemnation procedure for regulatory takings. *Id.* at 710. This deficiency meant that "Del Monte Dunes was not required to pursue relief in state court as a precondition to federal relief." *Id.* at 699. *Del Monte Dunes* and the present case, by contrast, are in no

way identical. In this case, the plaintiff asserts that his state-court claim will be unsuccessful; in *Del Monte Dunes*, a state court claim did not exist at all.

Finally, *San Remo Hotel, L.P. v. City and County of San Francisco*, 545 U.S. 323 (2005), confirms the prior cases on the state procedures requirement. *San Remo* suggested that the plaintiff must obtain "the entry of a final state *judgment* denying just compensation," *id.* at 337, and stated that "no claim that a state agency has violated the federal Takings Clause can be heard in federal court until the property owner has been denied just compensation through an *available* state compensation *procedure*," *id.* at 338 (emphasis added) (internal quotation marks omitted).

We recognize that various circuits have characterized the state procedures requirement differently. Some have spoken in terms of a "futility" exception, but even those have applied it sparingly, if at all, and no court appears to have established a futility exception in a case like the present one. *See Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 851 (9th Cir. 2001) (en banc) (finding futility exception where state supreme court was defendant in federal suit and denied possibility of state relief in its brief). In fact, the circuits that theoretically admit the possibility of a "futility" exception reject the argument that "adequate" state procedure must mean state procedure with a possibility of success. At least three circuits have dismissed the federal claims of a plaintiff who failed to use state procedures before they were time-barred, even though the inability to file in state court meant plaintiff "ha[d] permanently prevented the claim from ever ripening." *Liberty Mut. Ins. Co. v. Brown*, 380 F.3d 793, 799 (5th Cir. 2004); *see Pascoag Reservoir & Dam, LLC v. Rhode Island*, 337 F.3d 87, 93 n.5 (1st Cir. 2003) (same); *Harbours Pointe of Nashotah, LLC v. Vill. of Nashotah*, 278 F.3d 701, 706 (7th Cir. 2002) (same).

Other circuits, meanwhile, have characterized the state procedures requirement more stringently. *See, e.g.*, *Cormack v. Settle-Beshears*, 474 F.3d 528, 531 (8th Cir. 2007) ("We have been unable to find a case in which this court has declared a state's inverse condemnation procedures to be inadequate."); *Agripost, Inc. v. Miami-Dade County ex rel. Manager*, 195 F.3d 1225, 1231 & n.13 (11th Cir. 1999) (exceptions to state procedures requirement exist only where "state

law provides [owner] no process" or "due to state court interpretation, the process is inadequate," e.g., "the state court interpreted the law as capping the property owner's damages"). In short, neither the Supreme Court cases nor the decisions of other circuits provide any basis for allowing plaintiff to bring suit in federal court without utilizing state mechanisms of relief.

Plaintiff argues that our approach cannot be right, because it would work to keep him out of federal court altogether. In state court, the stare decisis effect of *Westside* would prevent the plaintiff from prevailing on his takings claim, after which a return to federal court would be barred by full faith and credit through the operation of South Carolina preclusion rules. *See* 28 U.S.C. § 1738 (2000); *Byrd v. City of Hartsville*, 620 S.E.2d 76, 79 n.6 (S.C. 2005) ("Takings analysis under South Carolina law is the same as the analysis under federal law.").

*San Remo* makes clear, however, that such an outcome poses no constitutional problem. In *San Remo*, the Supreme Court declined to create an exception to the full faith and credit statute "solely to preserve the availability of a federal forum" for litigants' federal takings claims. *See* 545 U.S. at 347. "It is hardly a radical notion," the Court noted, "to recognize that, as a practical matter, a significant number of plaintiffs will necessarily litigate their federal takings claims in state courts." *Id.* at 346. Indeed, "there is scant precedent for the litigation in federal district court of claims that a state agency has taken property in violation of the Fifth Amendment's takings clause. To the contrary, most of the cases in our takings jurisprudence . . . came to us on writs of certiorari from state courts of last resort." *Id.* at 347.

The Court in *San Remo* underscored the principle of federalism at the core of *Williamson*'s prudential ripeness requirements. It noted that "state courts undoubtedly have more experience than federal courts do in resolving the complex factual, technical, and legal questions" surrounding property regulation and are "fully competent to adjudicate constitutional challenges" in that arena. *Id.* The *Williamson* state procedures requirement puts such issues in the most competent hands; it minimizes conflicting holdings in state and federal courts (a conflict that plaintiff in fact is seeking to create); and it reduces the risk that legitimate exercises of state police power in furtherance of

important goals — such as public health, public welfare, and environmental protection — will be impeded by vexatious and repetitive litigation. We see no reason and we have no authority to second-guess the Supreme Court's conviction that claims for just compensation for regulatory takings by state agencies generally belong in state court.

III.

In the unlikely event that we misapprehend the import of *Williamson* and *San Remo*, plaintiff in any case lacks a valid constitutional claim. Plaintiff claims that Act 125 effected an uncompensated regulatory taking of his video poker machines, as well as his business's stock, location contracts, and goodwill.[1] Such claims are tenuous at best. As the Supreme Court has stated, "[G]overnment regulation — by definition — involves the adjustment of rights for the public good. Often this adjustment curtails some potential for the use or economic exploitation of private property. To require compensation in all such circumstances would effectively compel the government to regulate by *purchase*," *Andrus v. Allard*, 444 U.S. 51, 65 (1979) (ban on sale of protected bird artifacts not a taking). While *Andrus* involved conservation measures "designed to prevent the destruction of certain species of birds," *id.* at 52-53, the principle in that case was plain: it is possible to push the notion of regulatory takings to the point that the most basic exercises of the police power become the subject of ever more expense and litigation.

Even the owner of real property "necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992). But "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that new regulation might even render

---

[1]Without analyzing whether each alleged loss implicates a property interest recognized under South Carolina law, we note that at the least plaintiff makes a claim arising from his ownership of tangible assets, e.g., his video gaming machines, for which he may state a claim for just compensation, albeit an unsuccessful one. *See Rick's Amusement, Inc. v. South Carolina*, 570 S.E.2d 155, 158-59 (S.C. 2001).

his property economically worthless." *Id.* at 1027-28. Such is the "burden borne to secure the advantage of living and doing business in a civilized community." *Andrus*, 444 U.S. at 67 (internal quotation marks omitted).

This point has particular force in this case. Plaintiff is not challenging an ordinary regulation of an ordinary business, but a law relating to gambling — an area in which the state traditionally enjoys wide latitude to regulate activity minutely or to outlaw it completely. *See, e.g.*, *Lawton v. Steele*, 152 U.S. 133, 136 (1894) (recognizing regulation of gambling as traditional exercise of police power). The *Lawton* Court in fact spoke pointedly about gambling devices and declined to make the seizure of "the cards, chips, and dice of a gambling room" the subject of a takings challenge. *Id.* at 141.

Plaintiff attempts to distinguish cases which, like *Lawton*, involve forfeiture on the ground that, although Act 125 compels the forfeiture of video gaming machines, plaintiff's particular machines have not been subjected to a forfeiture proceeding. *See, e.g.*, *Bennis v. Michigan*, 516 U.S. 442, 452 (1996) (forfeiture comporting with due process does not constitute taking). As *Lawton* suggests, however, this distinction is meaningless for plaintiff's takings claim: whether the plaintiff complains of the physical taking of his property or the regulatory taking of its value, his claim depends upon the false premise that the state's legitimate regulation of gambling constitutes a taking.

Plaintiff's claim resembles previous, unsuccessful takings claims arising from another classic exercise of state police power: regulation of the sale of alcoholic beverages. The Supreme Court consistently rejected takings challenges to Prohibition-era regulations of previously acquired stock. *See Everard's Breweries v. Day*, 265 U.S. 545, 563 (1924) ("That [the challenged statute] did not take [claimants'] property in violation of the Fifth Amendment, is clear."); *Jacob Ruppert, Inc. v. Caffey*, 251 U.S. 264, 303 (1920) (same). Nor is the current situation different simply because it involves state rather than federal action, or because South Carolina has not banned all gambling but rather has instituted a state lottery. *See* 2001 S.C. Act No. 59 § 2. In fact, the Supreme Court has rejected takings claims arising from state regulations imposing partial rather than complete bans on alcoholic beverage sales. *See, e.g.*, *Mugler v. Kansas*, 123 U.S. 623, 668-

69 (1887) (rejecting takings challenge to Kansas law prohibiting manufacture or sale of beer without a permit and regulating the purposes for which beer could be manufactured).

Plaintiff contends that the fact that video gaming was legal in South Carolina for years gave him a legitimate expectation of its continued legality and hence the continued well-being of his business enterprise. But, as the Supreme Court pointed out in *Lucas*, the owner of any form of personal property must anticipate the possibility that new regulation might significantly affect the value of his business. *See* 505 U.S. at 1027-28.[2] This is all the more true in the case of a heavily regulated and highly contentious activity such as video poker. The pendulum of politics swings periodically between restriction and permission in such matters, and prudent investors understand the risk. As *Mugler* Court stated long ago of alcohol:

> It is true, when the defendants in these cases purchased or erected their breweries, the laws of the State did not forbid the manufacture of intoxicating liquors. But the State did not thereby give any assurance, or come under an obligation, that its legislation upon that subject would remain

---

[2]We believe that Supreme Court case law makes clear that gambling regulations like Act 125 per se do not constitute takings, and thus analysis under existing takings frameworks is unnecessary. Even if such analysis were appropriate, however, plaintiff's claim would fail. The *Lucas* test for regulations inflicting a complete loss of value does not apply, because *Lucas* by its own terms distinguishes personal property. *See* 505 U.S. at 1019, 1027-28. Meanwhile, under the *Penn Central* test for partial diminutions in value, partial takings claims entail "ad hoc, factual inquiries," focusing on, inter alia, the regulation's economic impact, particularly its interference with "distinct investment-backed expectations;" and "the character of the governmental action." *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). Plaintiff's participation in a traditionally regulated industry greatly diminishes the weight of his alleged investment-backed expectations, while the challenged government action is a classic "instance[ ] in which a state tribunal reasonably concluded that the health, safety, morals, or general welfare would be promoted" by the prohibition embodied in Act 125. *Id.* at 125 (internal quotation marks omitted). Thus, under any analysis, plaintiff's claim must fail.

unchanged. Indeed, the supervision of the public health and the public morals is a governmental power, continuing in its nature, and to be dealt with as the special exigencies of the moment may require; . . . for this purpose, the largest legislative discretion is allowed, and the discretion cannot be parted with any more than the power itself.

123 U.S. at 669 (internal citation and quotation marks omitted).

Given the nature of plaintiff's business, he was well aware that the South Carolina legislature might not continue to look favorably upon it. The fact that this possibility came to pass does not yield him a constitutional claim.

For the foregoing reasons, the judgment of the district court is hereby

*AFFIRMED.*