*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0043p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

TERRY WILKINS; SEAN TRIMBACH; MIKE STAPLETON; CINDY HUNTSMAN; CYRIL VIERSTRA, ROBERT SAWMILLER; STEVE FRANTZ,

> *Plaintiffs-Appellants*,

*v.*

DAVID T. DANIELS, in his official capacity as Director of the Ohio Department of Agriculture; THE OHIO DEPARTMENT OF AGRICULTURE,

> *Defendants-Appellees*,

THE HUMANE SOCIETY OF THE UNITED STATES,

> *Intervenor*.

No. 13-3112

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:12-cv-01010—George C. Smith, District Judge.

Argued: November 22, 2013

Decided and Filed:  March 4, 2014

Before:  DAUGHTREY, GIBBONS, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Robert M. Owens, OWENS LAW OFFICE, Delaware, Ohio, for Appellants. Eric E. Murphy, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.  Anna Frostic, THE HUMANE SOCIETY OF THE UNITED STATES, Washington, D.C., for Intervenor.  **ON BRIEF:** Robert M. Owens, OWENS LAW OFFICE, Delaware, Ohio, for Appellants.  Alexandra Schimmer, Michael J. Hendershot, James R. Patterson, Pearl M. Chin, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.  Anna Frostic, THE HUMANE SOCIETY OF THE UNITED STATES, Washington, D.C., Donald J. McTigue, Corey Colombo, Mark McGinnis, McTIGUE & McGINNIS LLC, Columbus, Ohio, for Intervenor.

1

—————————————

**OPINION**

—————————————

JULIA SMITH GIBBONS, Circuit Judge. This case involves constitutional challenges to the Ohio Dangerous Wild Animals and Restricted Snakes Act, Ohio Revised Code §§ 935.01–935.99.  Plaintiffs-appellants are seven owners of animals regulated by the Act.  Defendants-appellees are the Director of the Ohio Department of Agriculture, named in his official capacity, and the Ohio Department of Agriculture. After January 1, 2014, no person may possess a dangerous wild animal or restricted snake as defined by the Act without obtaining a permit.  As part of the permitting process, individuals are required to implant a microchip under the skin of their animals; yet individuals are not reimbursed for this expense.  There are exemptions from the Act's permitting requirements, including an exemption for individuals accredited by the Association of Zoos and Aquariums (AZA) or the Zoological Association of America (ZAA).

Appellants contend that the Act violates their First Amendment rights to freedom of association and speech because the Act's permitting requirements are so onerously expensive as to constitute a non-option—the only viable means to comply with the Act, appellants assert, is to join the AZA or ZAA.  Thus, appellants contend that they are compelled to associate with those organizations and to subsidize the organizations' speech.  Appellants also argue that the Act's microchipping requirement constitutes a physical taking in violation of the Fifth Amendment.

We affirm the district court's denial of injunctive relief.  Appellants' First Amendment claim fails because appellants have not demonstrated that they are compelled to join the AZA or ZAA.  Appellants' Taking Clause claim fails because the Act does not effect a physical taking.

**I.**

**A.**

In 2011, an Ohio man released over fifty exotic animals before committing suicide.  Partially in response, the Ohio General Assembly passed the Ohio Dangerous Wild Animals and Restricted Snakes Act.  Ohio Rev. Code §§ 935.01–935.99.  The Act is designed to regulate prospectively the acquisition, purchase, sale and transfer of "dangerous wild animals" and "restricted snakes" as defined in sections 935.01(C) and (L).  The Act went into effect on September 5, 2012.

All persons in possession of dangerous wild animals prior to September 5, 2012, were required to register with the Ohio Department of Agriculture, which administers the Act, by November 5, 2012.  *Id*. § 935.04(A).  In order to record and track these animals, the Act requires microchipping each registered dangerous wild animal at the time of registration.  *Id*. § 935.04(D).  This is a commonly used technique to track and identify animals.  The microchips must contain unique identification numbers and passive integrated transponders ("PIT tags").  *Id*.  The microchip, about the size of a grain of rice, is implanted under the skin of the animal to provide a permanent form of identification.  Once applied, the microchip may not be removed except "for purposes of a medical emergency by a veterinarian that is qualified to provide veterinary care to dangerous wild animals."  *Id.* § 935.18(B).

As noted above, the Act took full effect on January 1, 2014, prohibiting the possession of  a dangerous wild animal following that date.  *Id*. § 935.02(A).  A person already in possession of a dangerous wild animal and who wishes to continue to possess the animal after that date may obtain a wildlife shelter permit or a wildlife propagation permit.  *Id.* § 935.04(E).  An applicant for a wildlife shelter permit must provide identifying information as well as information demonstrating his or her ability to possess responsibly a dangerous wild animal.  *Id.* § 935.05(B).  In particular, an applicant must provide proof that he or she has at least two years of experience in the care of that species of dangerous wild animal or, in the alternative, the applicant must pass a written

examination regarding the care of dangerous wild animals. *Id*. § 935.05(B)(6). The applicant must also provide "[a] plan of action to be undertaken if a dangerous wild animal escapes." *Id*. § 935.05(B)(7). Not only is microchipping required for registration under the Act, it is also required prior to the issuance of a permit. *Id*. § 935.06(A)(2). There is no express exception to the microchipping requirement for permit applicants.[1]

Final issuance of a wildlife shelter permit is contingent upon sterilization of each male dangerous wild animal, unless a qualified veterinarian determines that sterilization is medically contraindicated. *Id*. § 935.06(A)(4). An applicant must sign an affidavit attesting that he or she will not allow members of the public to be in physical contact with the dangerous wild animal. *Id*. § 935.06(A)(5). Finally, an applicant must comply with the Department's standards of care and housing adopted by rule. *Id*. § 935.06(A)(3). The requirements for a wildlife propagation permit are substantially similar. *See id*. § 935.07(B).

Appellants' claims focus in large part on Ohio's caging regulations. Section 935.17 directs the Director of Agriculture to establish caging requirements for dangerous wild animals. Polly Britton, legislative agent for the Ohio Association of Animal owners, was on a task force assigned to discuss possible caging regulations. Britton testified that the emergency caging regulations adopted by the state were significantly more burdensome than ZAA or AZA requirements. For example, she testified that under the emergency regulations, there was a five-thousand square foot requirement for hyenas as opposed to a ZAA standard of six-hundred square feet. She explained: "The comments that were made during the task force meetings—and these were by Ohio Department of Agriculture officials—was that, when it comes time to write the rules, they would be so strict that owners could not, or would not, be able to keep their animals." And that, Britton testified, was "exactly what happened." Appellants point to these caging requirements as a major factor in their inability to comply with the Act's

---

[1]Counsel for the Humane Society testified that if microchipping is too risky for a particular animal, this issue could be raised as an equitable defense at an enforcement proceeding.

permitting requirements. Subsequent to the district court's order, the Department promulgated final regulations that were less stringent than originally proposed.

As a general matter, the permitting requirements for restricted snakes are substantially similar. However, neither registration nor microchipping is required. *See* Ohio Rev. Code §§ 935.04, 935.08–935.10. An animal owner is entitled to appeal the denial or revocation of a permit. *Id*. § 935.06(E)-(F) (dangerous wild animals); *id*. § 935.09(E)-(F) (restricted snakes).

The Act's general prohibition on possession of dangerous wild animals and restricted snakes is subject to fourteen exemptions, including: facilities accredited by the AZA or the ZAA;[2] research facilities as defined in the federal animal welfare act; research facilities accredited by the association for the assessment and accreditation of laboratory animal care international; circuses; wildlife rehabilitation facilities permitted by the Ohio Department of Natural Resources ("ODNR"); veterinarians providing temporary veterinary care; wildlife sanctuaries; individuals transporting such an animal, subject to various requirements; educational institutions that display a single dangerous wild animal as a sports mascot, subject to various requirements; persons issued permits for scientific or educational use; persons issued permits for native threatened species; mobility impaired persons possessing certain primate species; deaf persons possessing certain primate species; and blind persons possessing certain primate species. *Id*. § 935.03(B). An animal owner is not required to microchip his or her animal if he or she meets one of these exemptions. *Id*.

The Act provides that if an owner is not able to obtain a permit or meet an exemption, the owner must transfer, within thirty days, all animals that the person possesses to a humane society, wildlife sanctuary, rescue facility, facility that is an accredited member of either the AZA or ZAA, or facility that is located in another state and complies with that state's applicable laws. *Id*. § 935.06(F) (dangerous wild animals); *id*. § 935.09(F) (restricted snakes). Such a person must pay all costs associated

---

[2]Some appellants are associate members with either the AZA or ZAA, but the costs of accreditation that would trigger this exemption are significantly greater than membership costs.

with the transfer. *Id*. § 935.06(F) (dangerous wild animals); *id*. § 935.09(F) (restricted snakes). The Director may also assess a civil penalty against any person not in compliance with Chapter 935 or the promulgated rules. *Id*. § 935.24(B)(1). Any person assessed a civil penalty has the opportunity for an administrative hearing. *Id*. § 935.24(B)(2). The Act also prescribes criminal penalties for noncompliance with certain provisions. *Id.* § 935.99.

Appellants Terry John Wilkins, Cynthia Huntsman, Mike Stapleton, Cyril Vierstra, Robert Sawmiller, Steve Frantz, and Sean Trimbach are a group of self-described exotic animal enthusiasts. Each owns animals regulated by the Act and each believes that he or she cannot comply with the Act's permitting requirements and does not otherwise fit within an exemption. Appellants testified that they would not be willing to join either the AZA or ZAA, whose views they abhor, because those organizations "are at opposite ends of the spectrum." Some appellants own elderly animals, for example, African servals and lions, whose lives would be endangered, appellants claim, if they were subject to anesthesia in order to microchip them.

**B.**

Appellants brought suit in the United States District Court for the Southern District of Ohio under 42 U.S.C. § 1983 challenging the constitutionality of the Act. Appellants contended that the Act violated their First Amendment rights to freedom of speech and association, effected a deprivation of property without due process of law in violation of the Fourteenth Amendment and the Ohio Constitution, and that the Act effected either a physical or regulatory taking without just compensation in violation of the Fifth Amendment. Appellants sought injunctive relief, declaratory relief, and nominal damages.

The Humane Society filed a motion to intervene, which the district court granted. In November 2012, appellants moved for a temporary restraining order and a preliminary injunction. The district court consolidated the evidentiary hearing on appellants' motion with a full trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. The district court took testimony on appellants' claims from December

10–12, 2012.  The district court then denied appellants' motions for a temporary restraining order, preliminary and permanent injunction in their entirety.  Appellants timely appealed.[3]

## II.

## A.

Appellants' motion for a preliminary injunction was converted to a trial on the merits. Ordinarily, this court reviews a challenge to the grant or denial of a request for a permanent injunction for abuse of discretion.  *See Parks v. City of Columbus*, 395 F.3d 643, 647 (6th Cir. 2005).  However, we review the district court's legal conclusions *de novo*.  *Id.*[4]

## B.

Appellants bring two distinct but interrelated First Amendment claims.  First, appellants assert that the Act violates their First Amendment freedom of association rights because they believe it forces them to join either the AZA or ZAA.  Second, appellants assert that the Act violates their First Amendment freedom of speech rights "by compelling Appellants to subsidize the speech of their purely private political and ideological rivals," the AZA or ZAA.

The Supreme Court "has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).  The Constitution guarantees this freedom of association because it is "an indispensable means of preserving other individual

---

[3]Appellants do not appeal the district court's judgment with respect to their federal and state procedural due process claims and their regulatory takings claim.

[4]There are no factual disputes present in this appeal.

liberties." *Id.* A corollary to this right is the right not to associate. *Cal. Democratic Party v. Jones*, 530 U.S. 567, 574 (2000).**5**

As the First Amendment protects freedom of association and the corollary right not to associate, so too does it protect freedom of speech and the corollary right not to speak. "Closely related to compelled speech and compelled association is compelled funding of the speech of other private speakers or groups." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2288 (2012). "[C]ompulsory subsidies for private speech are subject to exacting First Amendment scrutiny . . . ." *Id.* at 2289.

The threshold inquiry in a compelled subsidy case is whether the State has "mandated association." *United States v. U.S. Foods, Inc.*, 533 U.S. 405, 414 (2001); *see also Knox*, 132 S. Ct. at 2289. If the association is not compelled, neither are the subsidies for the organization's speech. Thus, to prevail on either of appellants' First Amendment claims, they must establish that joining the AZA or ZAA is mandatory; what is fatal to the compelled association claim is fatal to the compelled subsidy claim. *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647–54 (2000); *Roberts*, 468 U.S. at 622–29; *Knox*, 32 U.S. at 2289; *Keller v. State Bar of Cal.*, 496 U.S. 1, 7–17 (1990). Accordingly, we consider both claims together.

There are fifteen ways appellants can comply with the Act: the permitting requirement and fourteen exemptions. Appellants' argument hinges on the proposition that only one of these options is actually available—joining the AZA or ZAA. *See* Ohio Rev. Code § 935.03(B)(1). Appellants assert that "the Act provides a textbook Hobson's choice": the permitting requirements are too expensive and no exemption other than the

---

**5**Supreme Court case law on compelled association has either considered whether an organization can be forced to accept members or whether individuals compelled to associate with an organization can be forced to subsidize that organization's speech. We assume, *arguendo*, that appellants can state compelled association claims on the basis of being compelled to join an organization. *Cf. Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion) (holding county sheriff's office could not fire or threaten dismissal of employees for failure to affiliate with a political party); *Menkes v. St. Lawrence Seaway Pilots' Ass'n*, 269 F. App'x 54, 56 (2d Cir. 2008) ("Without violating the Constitution, the government can compel an individual to join a professional association as a condition of employment." (citing *Keller v. State Bar of Cal.*, 496 U.S. 1, 8 (1990)).

AZA or ZAA exemption applies, therefore appellants' only feasible option is to join the AZA or ZAA.

State compulsion has been defined largely in the context of compelled speech. A "general principle of compelled speech jurisprudence . . . is that a violation of the First Amendment right against compelled speech occurs only in the context of actual compulsion." *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005). "In order to compel the exercise or suppression of speech, the governmental measure must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000) (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)); *see also Axson-Flynn v. Johnson*, 356 F.3d 1277, 1290 (10th Cir. 2004). The consequence need not be direct; imprisonment, fines, injunctions, or taxes may suffice. *Axson-Flynn*, 356 F.3d at 1290; *see also C.N.*, 430 F.3d at 189. "A discouragement that is 'minimal' and 'wholly subjective' does not, however, impermissibly deter the exercise of free speech rights." *Phelan*, 235 F.3d at 1247–48 (quoting *United States v. Ramsey*, 431 U.S. 606, 623–624 (1977)).

A brief comparison of cases in which state compulsion has been found and where state compulsion has been found lacking demonstrates that the State of Ohio has not compelled appellants to join the AZA or ZAA. In the compelled association cases, the compulsion has generally operated by force of law: accept these members or be in violation of a public accommodation law. *See Dale*, 530 U.S. at 645–46; *Roberts*, 468 U.S. at 615–16. In compelled subsidy cases, plaintiffs have generally been presented with a binary choice between subsidizing speech or quitting their jobs. *See Keller*, 496 U.S. at 5–6; *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 211 (1977). In the compelled speech arena, the Supreme Court has struck down a state statute requiring schoolchildren to recite the Pledge of Allegiance and to salute the American flag, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), as well as a state statute requiring residents to display the state's motto on their license plates, *Wooley v. Maynard*, 430 U.S. 705, 717 (1977). In contrast, in the absence of state mandated

penalties coercing an individual to choose a course of conduct, state compulsion has not been found. *See Phelan*, 235 F.3d at 1248; *C.N.*, 430 F.3d at 189.

In the instant case, appellants do not contend that they will be penalized if they do not join the AZA or ZAA. Rather, they contend that they are unwilling or unable to meet fourteen other options available to them. This is not the type of compulsion that qualifies them for First Amendment protection. We need look no further than the Act's permitting requirements to see why this is the case. Appellants contend that the costs of complying with the permitting requirements are "so exorbitantly high" as to present an illusory option. Appellants' objections stem primarily from the caging requirements promulgated under the Act.

Since the district court's order, Ohio has promulgated final regulations for caging requirements. Ohio Admin. Code § 901:1–4. Appellants are correct that this court should not unduly speculate about the cost of compliance with the final regulations. Nevertheless, it is sufficient to note that the final regulations are substantially less onerous than originally proposed. The cost of compliance with the final regulations does not make this a sham option.

Nor is obtaining a permit the only option available to appellants under the Act. Of the fourteen exemptions to the permitting requirement, the ODNR educational use permit would appear a strong candidate for many of the appellants. *See* Ohio Rev. Code § 935.03(B)(10); *id*. § 1533.08. A permittee under that section need only pay an annual fee of twenty-five dollars and is not required to microchip his or her animals. *Id.* § 1533.08; *id.* § 935.03(B). And Sawmiller and Trimbach actually have native wildlife permits under Ohio Revised Code section 1531.25, which exempt those animals covered by the permits from the Act's requirements. *Id*. § 935.03(B)(11).

Finally, appellants have not even established that joining the AZA or ZAA is an available option. Sawmiller testified that he could not sustain his business if he joined the AZA or ZAA because he would have to limit his exhibition of wild animals to schools only. Likewise, Huntsman testified that joining the AZA and ZAA was "not feasible." Wilkins testified that he could meet neither the AZA or ZAA's "physical

requirements for their facilities" nor Ohio's requirements. Trimbach testified that he could not continue his business profitably if he joined either the AZA or ZAA. And Vierstra testified that he would not be able to afford becoming a member of the ZAA and doubted whether he would qualify for membership. Appellants clearly are not required to join the AZA or ZAA if they are incapable of joining those organizations.

On the most general level, the plain language of the Act and its practical application demonstrate that appellants do have options. Mere unwillingness to conform their conduct to the permitting requirements or the other thirteen exemptions does not mean that the Act compels appellants to join the AZA or ZAA. The Act imposes a choice on appellants, even though it is not a choice they welcome. Appellants "wholly subjective" belief that the Act compels them to join the AZA or ZAA is insufficient to trigger either compelled association or compelled subsidy protection under the First Amendment. *See Phelan*, 235 F.3d at 1247. The burden of regulation may, unfortunately, fall heavier on some than on others, but that, without more, is not enough to render this Act unconstitutional.

## C.

Appellants contend that the Act's microchipping requirement effects a physical taking without compensation in violation of the Takings Clause of the Fifth Amendment. Before turning to the merits of that claim, we must consider whether it is ripe.

## 1.

Applicable to the States through the Fourteenth Amendment, the Takings Clause of the Fifth Amendment "provides that private property shall not 'be taken for public use, without just compensation.'" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005) (quoting U.S. Const. amend. V). It is important at the outset to distinguish two different types of Takings Clause challenges: challenges to the public-use requirement and challenges to the just-compensation requirement. Public-use challenges assert that in effecting the taking, the government exceeded its permissible scope of authority under the Constitution; the action is invalid regardless of whether compensation is provided.

Just-compensation challenges concede that the government acted within the scope of its authority and assert that the government must provide the affected party with "just compensation."

Appellants bring a just-compensation challenge. With regard to this type of challenge, the Supreme Court has clarified:

> As its text makes plain, the Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." In other words, "it is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking."

*Id*. at 536–37 (internal citations omitted) (quoting *First English Evangelical Lutheran Church of Glendale v. Cnty. of L.A.*, 482 U.S. 304, 314–15 (1987)). "Nor does the Fifth Amendment require that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a reasonable, certain and adequate provision for obtaining compensation exist the time of the taking." *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985) (internal quotation marks omitted). Generally, then, a State does not violate the Takings Clause "until it refuses to compensate the owner." *Hensley v. City of Columbus*, 557 F.3d 693, 695–96 (6th Cir. 2009); *see also Williamson Cnty.*, 473 U.S. at 195 ("[T]he State's action is not 'complete' in the sense of causing a constitutional injury 'unless or until the State fails to provide an adequate postdeprivation remedy for the property loss.'" (quoting *Hudson v. Palmer*, 468 U.S. 517, 532 n.12 (1984))).

*Williamson County* elaborates a two-part ripeness test. A federal court may hear a takings claim only after: (1) the plaintiff has received a "final decision" from the relevant government actor; and (2) the plaintiff has sought "compensation through the procedures the State has provided for doing so." *Williamson Cnty.*, 473 U.S. at 186, 194–95. We apply this test to both regulatory and physical takings claims. *See Hensley*, 557 F.3d at 696 n.2; *River City Capital, L.P. v. Bd. of Cnty. Comm'rs*, 491 F.3d 301, 307 (6th Cir. 2007); *Arnett v. Myers*, 281 F.3d 552, 563 (6th Cir. 2002).

Appellants contend that *Williamson County* is inapplicable to facial challenges. Their argument oversimplifies Takings Clause jurisprudence. With respect to just-compensation challenges, while *Williamson County*'s first requirement may not apply to facial challenges, its second requirement—that plaintiffs must seek just compensation through state procedures—does. *See Alto Eldorado P'ship v. Cnty. of Santa Fe*, 634 F.3d 1170, 1177 (10th Cir. 2011) ("Courts considering claims alleging a . . . taking without just compensation, even when characterized as facial claims, have applied the second *Williamson County* requirement . . . ." (citing *Equity Lifestyle Props., Inc. v. Cnty. of San Louis Obispo*, 548 F.3d 1184, 1190 n.13 (9th Cir. 2008); *Cnty. Concrete Corp. v. Twp. of Roxbury*, 442 F.3d 159, 168 (3d Cir. 2006); *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d 404, 407 (4th Cir. 2007))).[6]

Appellants do not contend that they sought compensation in state court or that Ohio does not provide an adequate remedy. *See Williamson Cnty.*, 473 U.S. at 194 (explaining "all that is required is that a reasonable, certain and adequate provision for obtaining compensation exist at the time of the taking" (internal quotation marks omitted)). Ordinarily this would end our inquiry. However, *Williamson County* ripeness is a prudential doctrine. *See Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733–34 (1997).

The requirement to seek compensation prior to bringing suit will often serve important federalism interests. In regulatory takings cases involving sensitive issues of state policy, or cases that turn on whether the plaintiff has a property interest as defined by state law, ripeness concerns will prevent a federal court from reaching the merits prematurely. But where it is clear that there has been no "taking," an issue of federal

---

[6]Not subject to *Williamson County*'s second requirement, and for a very good reason, are public-use challenges. *See, e.g., San Remo Hotel, L.P. v. City & Cnty. of San Fransisco*, 545 U.S. 323, 345-46 (2005). Because compensation is irrelevant to a public-use challenge—the state action either did or did not exceed the scope of the government's constitutional authority—*Williamson County*'s state procedures requirement makes little sense in the context of a public-use challenge. *See Alto Eldorado*, 634 F.3d at 1176.

Much of the confusion surrounding this issue stems from *Yee v. City of Escondido*, 503 U.S. 519, 533–34 (1992), and its progeny, on which appellants rely. There, the Supreme Court stated that where petitioners brought a facial challenge asserting that the ordinance at issue did not substantially advance a legitimate state interest, *Williamson County* was inapplicable. *Id*. at 534. The "substantially advance" theory, now defunct, *see Lingle*, 544 U.S. at 548, is best thought of as a species of public-use challenge that has no application here. *See Alto Eldorado*, 634 F.3d at 1176 n.3.

constitutional law, no jurisprudential purpose is served by delaying consideration of the issue. If anything, dismissing the case on ripeness grounds does a disservice to the federalism principles embodied in this doctrine as it would require the state courts to adjudicate a claim, already before the federal court, that clearly has no merit. We therefore turn to whether the Act effects a taking.

**2.**

Appellants raise only a physical takings claim. "[P]hysical takings require compensation because of the unique burden they impose: A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property—perhaps the most fundamental of all property interests." *Lingle*, 544 U.S. at 539. Appellants argue that any law that effects a physical invasion of an individual's property effects a taking. Yet *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982), the seminal case on physical takings, made clear that not every permanent physical invasion rises to the level of a taking. Only "[w]hen the government physically takes possession of an interest in property," *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002), or authorizes a "physical occupation . . . by a third party," *Loretto*, 458 U.S. at 440, does state action rise to the level of a taking.

For this reason, *Loretto* explained that the Takings Clause does not impinge on a state's ability to pass regulations for the general welfare in most cases. The Court emphasized: "our holding today in no way alters the analysis governing the State's power to require landlords to comply with building codes and provide utility connections, mailboxes, smoke detectors, fire extinguishers, and the like in the common area of a building." *Id.* Those types of regulations are not constitutionally suspect because they do not involve government occupation or a government-authorized occupation by a third party. *Id.*

Here, neither the government nor a third party has occupied appellants' property. If appellants do not qualify for an exemption from the Act's permitting requirements, they are required to implant microchips in animals classified as "dangerous wild

animals." *See* Ohio Rev. Code § 935.04(D).[7] But even after appellants implant the microchips, they retain the ability to use and possess their animals and the implanted microchips. Indeed, the Act is close kin to the general welfare regulations that the Supreme Court ensured were not constitutionally suspect. There is little difference between a law requiring a microchip in an animal and a law requiring handrails in apartment buildings. Both are regulations of individuals property properly challenged as regulatory takings, *Loretto*, 458 U.S. at 440, and neither law effects a government occupation of property or a government-authorized occupation of property by a third party. As appellees point out, were the Act's microchipping requirement to be ruled a taking, "laws requiring license plates on cars, warning labels on packaging, lighting on boats, handrails in apartment buildings, and ramps leading to restaurants" would be suspect. This is to say nothing of the implications for the myriad state laws regarding the microchipping of exotic and domesticated animals as well as the ear-tagging of agricultural animals. *Loretto* established a "narrow" rule applicable to "[]possessory governmental activity." 458 U.S. at 440–41. The Act's microchipping requirement does not fit within this narrow rule.

### III.

Appellants' constitutional claims lack merit. We therefore affirm the district court's final judgment denying injunctive relief.

---

[7]There is a tension between appellants' First Amendment and Fifth Amendment claims. If the Act requires appellants to join the AZA or ZAA, appellants would not be required to microchip their animals. *See* Ohio Rev. Code § 935.03(B) (exempting owners who qualify for an exemption from all but submitting a registration form). It is only if appellants are not required to join the AZA or ZAA and do not qualify for another exemption that the microchipping requirement would be applicable.