**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-2474**

MARYLAND SHALL ISSUE, INCORPORATED; PAUL MARK BROCKMAN;
ROBERT BRUNGER; CAROLINE BRUNGER; DAVID ORLIN, all of the above
individually named plaintiffs on behalf of themselves and all others similarly
situated,

Plaintiffs – Appellants,

v.

LAWRENCE HOGAN, in his capacity of Governor of Maryland,

Defendant – Appellee.

------------------------------

GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE,

Amicus Supporting Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore.
James K. Bredar, Chief District Judge. (1:18-cv-01700-JKB)

Argued: January 29, 2020                          Decided: June 29, 2020

Before FLOYD, THACKER and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge Floyd
joined. Judge Richardson wrote an opinion concurring in the judgment in part and
dissenting in part.

**ARGUED:** Mark William Pennak, MARYLAND SHALL ISSUE, INC., Annapolis, Maryland, for Appellants. Adam Dean Snyder, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee. **ON BRIEF:** Cary J. Hansel, Erienne A. Sutherell, HANSEL LAW, P.C., Baltimore, Maryland, for Appellants. Brian E. Frosh, Attorney General, Jennifer L. Katz, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee. Scott A. Edelman, Los Angeles, California, Kathryn Cherry, Dallas, Texas, Vivek R. Gopalan, GIBSON, DUNN & CRUTCHER, San Francisco, California; Hannah Shearer, San Francisco, California. J. Adam Skaggs, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, New York, New York, for Amicus Curiae.

---

THACKER, Circuit Judge:

On its own behalf and on behalf of its members, Maryland Shall Issue, Inc. ("MSI") challenges a Maryland statute banning "rapid fire trigger activators" -- devices that, when attached to a firearm, increase its rate of fire or trigger activation. MSI argues the statute violates the Takings Clause of the United States Constitution as well as Maryland's takings provisions. And because the statute does not define "rate of fire" or "trigger activation," MSI also argues it is void for vagueness. The district court held MSI did not have organizational standing to pursue these claims on its own behalf and also rejected its substantive contentions.

Because we agree with the district court that MSI lacks standing and that the Complaint otherwise fails to state a claim, we affirm for the reasons detailed herein.

I.

On April 24, 2018, Maryland Governor Lawrence Hogan ("Appellee" or "Maryland") signed Senate Bill 707 ("SB-707") into law. SB-707 makes it unlawful for any person to "manufacture, possess, sell, offer to sell, transfer, purchase, or receive a rapid fire trigger activator" or to "transport" such a device into the state. SB-707, sec. 2, § 4-305.1(a). Violation of SB-707 is a criminal misdemeanor subject to a term of imprisonment of up to three years, a fine of up to $5,000, or both. *Id.*, sec. 1, § 4-306(a).

SB-707 defines "rapid fire trigger activator" as "any device, including a removable manual or power-driven activating device, constructed so that, when installed in or attached to a firearm the rate at which the trigger is activated increases; or the rate of fire increases."

3

SB-707, sec. 1, § 4-301(M)(1).  In addition to any other device which increases the rate of trigger activation or fire, SB-707 specifies that the following enumerated devices are rapid fire trigger activators: "a bump stock, trigger crank, hellfire trigger, binary trigger system, burst trigger system, or a copy or a similar device, regardless of the producer or manufacturer."  *Id.*  § 4-301(M)(2).  Further, SB-707 exempts from the definition any "semiautomatic replacement trigger that improves the performance and functionality over the stock trigger."  *Id.* § 4-301(M)(3).

SB-707 contains an exception clause which purports to permit individuals to continue to possess the otherwise prohibited devices, provided that the individual "(1) possessed the rapid fire trigger activator before October 1, 2018; (2) applied to the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ["ATF"] before October 1, 2018, for authorization to possess a rapid fire trigger activator; (3) received authorization to possess a rapid fire trigger activator from the [ATF] before October 1, 2019; and (4) is in compliance with all federal requirements for possession of a rapid fire trigger activator." SB-707, sec. 1, § 4-305.1(b).  However, on the day SB-707 went into effect, October 1, 2018, the ATF released a "Special Advisory" on its website indicating, "ATF is without legal authority to accept and process [the exception] application."  J.A. 13.[1]  Consequently, the ATF asked Maryland residents to not file any such applications and advised that any it received would be "returned to the applicant without action."  *Id.*

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

On June 11, 2018, MSI and four individual plaintiffs (collectively, "Appellants") filed the instant putative class action complaint in the District of Maryland (the "Complaint"). The Complaint alleged five counts, which the district court characterized as follows:

- In Counts I and II, [Appellants] argue that [SB-707] is a per se taking without just compensation under the United States Constitution, as well as the Maryland Constitution, to the extent its Takings Clause follows federal law.

- In Counts II and V, [Appellants] put forward a separate per se takings theory under the State Constitution—that [SB-707] retrospectively abrogates vested property rights in violation of Article 24, which also constitutes a taking under Maryland law.

- In Count IV, [Appellants] argue that [SB-707] is unconstitutionally vague, because its terms can be read to encompass a number of devices that have only "minimal" impact on a firearm's rate of fire and are otherwise functionally and operationally dissimilar to bump stocks and other devices named in the Act.

- In Count III, [Appellants] argue that ATF's refusal to process applications and grant authorizations for continued lawful possession makes it "legally impossible to comply" with [SB-707]'s exception clause, thus imposing a "legally impossible condition precedent" that violates due process and cannot be severed from the rest of [SB-707].

J.A. 232–33.

Appellee moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). After a hearing, the district court granted Appellee's 12(b)(6) motion with respect to all counts except Count IV. Thereafter, the district court sua sponte dismissed Count IV pursuant to Federal Rule of Civil Procedure

5

12(b)(1) after determining that all plaintiffs lacked standing to pursue the vagueness claim. Although the district court also determined that MSI lacked organizational standing to sue on its own behalf, it nonetheless concluded that MSI did have representative standing to sue on behalf of its members.

Appellants noted a timely appeal to this court.

## II.

We review dismissals pursuant to Federal Rule of Civil Procedure 12(b)(6) de novo. *Ott v. Maryland Department of Public Safety and Correctional Services*, 909 F.3d 655, 658 (4th Cir. 2018). To survive a 12(b)(6) motion, a complaint must contain enough facts "'to raise a right to relief above the speculative level' and 'state a claim to relief that is plausible on its face.'" *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[A]lthough a court must accept as true all factual allegations contained in a complaint, such deference is not accorded legal conclusions stated therein," and "[t]he mere recital of elements of a cause of action, supported only by conclusory statements is not sufficient." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012).

A dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is also reviewed de novo. *See Demetres v. East West Const., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015). When reviewing a complaint dismissed for failure to allege facts supporting subject matter jurisdiction, we afford the plaintiff "the same procedural protection as she would receive under a Rule 12(b)(6) consideration, wherein the facts alleged in the complaint are taken as true, and the defendant's challenge must be denied if the complaint alleges sufficient

6

facts to invoke subject matter jurisdiction." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (internal quotation marks and citations omitted).

III.

A.

<u>MSI's Organizational Standing</u>

Appellants' first claim of error is that the district court wrongly determined MSI lacked organizational standing to sue on its own behalf.

An organization can sue on its own behalf rather than as a representative of its members when it independently satisfies the elements of Article III standing: (1) "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted). "[A] mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient [to establish standing]." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (internal quotation marks omitted).

The district court determined MSI failed to meet the first prong of Article III standing -- injury in fact. In the Complaint, MSI alleged "SB 707 requirements directly harm MSI as an organization by undermining its message and acting as an obstacle to the organization's objectives and purposes." J.A. 11–12. In support, MSI alleged it

7

seeks to educate the community about the right of self-protection, the safe handling of firearms, and the responsibility that goes with carrying a firearm in public. The purposes of MSI include promoting the exercise of the right to keep and bear arms; and education, research, and legal action focusing on the Constitutional right to privately own, possess and carry firearms and firearms accessories.

*Id.*

MSI argues the district court erred because the Supreme Court has found standing where a defendant's actions impede an organization's efforts to carry out its mission. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982)). However, MSI's alleged harms fall well short of the harms alleged in *Havens*. There, the plaintiff was a non-profit organization offering counseling and referrals to clients in search of equal opportunity housing. *See Havens*, 455 U.S. at 368. When the plaintiff organization in *Havens* was faced with complaints of housing discrimination in its service area, it investigated and referred those complaints to the relevant authorities. *See id.* The plaintiff organization and its members sued Havens Realty Corporation ("Havens") for violating the Fair Housing Act of 1968. *See id.* at 366.

In alleging organizational standing, the plaintiff organization argued Havens' practices had frustrated its counseling and referral services, causing a drain on resources. *See id.* at 379. Specifically, the plaintiff organization alleged it had expended resources to identify and counteract Havens' discriminatory practices. *See id.* The Supreme Court found standing. It held that Havens' practices had "perceptibly impaired" the plaintiff's activities and "[s]uch concrete and demonstrable injury to the organization's activities—

8

with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

Here, MSI only alleged that SB-707 "undermined" and "acted as an obstacle to" its purpose and message. J.A. 11–12. MSI did not allege that it had expended resources as a result of SB-707, nor did it explain a way in which SB-707 "perceptibly impaired" its activities. *Havens*, 455 U.S. at 379. Instead, MSI only alleged, at most, a "setback to its social interests." *Id.* And, as this court has explained,

> to determine that an organization that decides to spend its money on educating members, responding to member inquiries, or undertaking litigation in response to legislation suffers a cognizable injury would be to imply standing for organizations with merely "abstract concern[s] with a subject that could be affected by an adjudication."

*Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 40 (1976)). MSI's alleged injury is no more than a mere disagreement with the policy decisions of the Maryland legislature, which is insufficient to meet the constitutional threshold for an injury in fact.

Accordingly, we agree with the district court that MSI lacks organizational standing.

B.

Standing as to Vagueness Challenge

Next, we address Appellants' argument that the district court improperly dismissed their pre-enforcement vagueness challenge for lack of standing.[2]

---

[2] Appellants first argue the district court improperly considered standing without providing notice to the parties. However, because a "federal court has an independent obligation to assess its subject-matter jurisdiction," we find no error in the district court's (Continued)

9

Appellants alleged in the Complaint that SB-707 is unconstitutionally vague in defining a rapid fire trigger activator as "any device . . . constructed so that, when installed in or attached to a firearm[,] the rate at which the trigger is activated increases; *or the rate of fire increases*." SB-707, sec. 2, § 4-301(M)(1) (emphasis supplied). Though SB-707 includes a list of enumerated devices that are encompassed by this definition, Appellants argue it can also include any number of other firearm accessories "that modify a firearm's rate of fire to mimic that of an automatic firearm, as well as any device that increases the rate of fire by any marginal amount, *no matter how minimally*." Appellants' Br. 25 (emphasis in original). According to Appellants, the term "rate of fire" is "unintelligible" when applied to semi-automatic and single-action firearms because such firearms have no "mechanically determinable" speed for "how fast mechanically the firearm can fire while cycling rounds through the chamber while the trigger is held down." *See id.* at 28–29. Instead, Appellants allege the rate of fire for a semi-automatic firearm is "as fast as the trigger can be pulled for each shot." *Id.* Appellants claim this speed can vary from person to person. Indeed, Appellants argue SB-707 is so vague that it could include devices that help *the shooter* be prepared to aim and fire more quickly. *See id.* at 25–27. They claim devices such as a bipod for stabilizing the firearms, slings used to stabilize weapons on shooters' arms, barrel weights used to reduce recoil, and muzzle devices designed to direct gasses away from the shooter's line of sight are all examples of

---

decision to consider standing. *Constantine v. Rectors & Visitors of George Mason Univ.*, 441 F..3d 474, 480 (4th Cir. 2005).

devices "that marginally increase the 'rate of fire' [of the shooter] by *some small amount."* *Id.* at 26 (emphasis in original).

Rather than determining whether Appellants stated a claim that SB-707 is unconstitutionally vague, however, the district court determined Appellants lacked standing to pursue such a pre-enforcement challenge. As discussed above, to possess standing, Appellants needed to allege a sufficient injury in fact. *Lujan*, 504 U.S. at 560–61. A plaintiff alleges sufficient injury in a pre-enforcement suit if she alleges [1] "'intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [2] there exists a credible threat of prosecution thereunder.'" *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (quoting *Babbitt v. Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). A credible threat of prosecution exists only if it "is not imaginary or wholly speculative," chimerical, or wholly conjectural. *Id.* (internal quotation marks and citations omitted). The district court determined, "Plaintiffs do not allege any facts suggesting a 'credible threat' that [SB-707] will be enforced in accordance with Plaintiffs' broad reading. . . . Plaintiffs simply have not alleged any facts suggesting that the threat of such enforcement rises above pure speculation and conjecture." J.A. 251–52.

Though the district court based its decision on Appellants' lack of a credible threat of prosecution, *Kenny's* second prong, we hold that Appellants fail on the first prong of *Kenny* -- they have not stated an intent to engage in conduct *arguably* proscribed by a statute. *Kenny*, 885 F.3d at 288; *see United States v. McHan*, 386 F.3d 620, 623 (4th Cir. 2004) (recognizing "we are, of course, entitled to affirm on any ground appearing in the

11

record, including theories not relied upon or rejected by the district court" (alterations and internal quotation marks omitted)). Though Appellants claim they own "potentially banned devices" such as bipods, slings, and barrel weights, we are unpersuaded that those devices are even arguably proscribed by SB-707. SB-707 prohibits devices "constructed so that, when [they are] installed in or attached to a firearm[,] (i) the rate at which the trigger is activated increases; or (ii) the rate of fire increases." SB-707, sec. 1, § 4-301(M)(1). The enumerated devices encompassed by the term "rapid fire trigger activator" all actually increase the rate at which the *firearm* is capable of firing. Indeed, such devices essentially turn firearms into automatic weapons. By contrast, the devices Appellants suggest may minimally increase the rate of fire do not increase the rate at which the *firearm* is capable of firing. Instead, those devices help prepare the *shooter* to fire again more quickly than she may have been able otherwise. But these devices Appellants point to are not similar in design or function to the devices banned by SB-707. As a result, they do not even come close to accomplishing what SB-707 set out to ban -- they do not activate a trigger for rapid fire.

Thus, we find no basis to hold that Appellants have alleged an intent to engage in a course of conduct arguably proscribed by SB-707. For the same reasons, we hold that Appellants have not shown a credible threat that SB-707 would be enforced in this manner. Accordingly, we affirm the district court on this issue.

12

C.

Failure to State a Takings Clause Claim

Appellants also argue the district court wrongly determined they failed to state a claim that SB-707 violates the Takings Clauses of the United States Constitution and the Maryland Constitution, Art. III, section 40, to the extent it is analogous to the federal Constitution.

The Fifth Amendment to the Constitution, incorporated to the states via the Fourteenth Amendment, provides "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. A "taking" can be of personal or real property, and it can be effected through either a physical appropriation of the property by the Government or through a regulation that goes "too far" in depriving the owner of her property rights. *See e.g. Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014–15 (1992). Each of these scenarios has been treated differently in Takings jurisprudence. Relevant here, Appellants claim SB-707 effects a per se taking of their personal property.[3][4] Specifically, because the provision permitting registration with the

---

[3] Appellants only argue SB-707 amounts to a per se taking. They make no argument that, even if SB-707 is not a per se taking, it would be a taking when analyzed pursuant to the ad hoc balancing test set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S, 104, 124 (1978). Therefore, we do not analyze SB-707 under that test.

[4] We pause here to note a fundamental distinction between the majority and the dissenting opinions. The dissent is of the view that the two types of takings are "classic" or per se takings, and "regulatory" takings. Thus, according to the dissent, for the taking here to be per se, it must fall under the framework of a "classic" taking, which occurs when the Government itself directly physically appropriates property "for its own use." *Horne v. Dept. of Agriculture*, 135 S. Ct. 2419, 2425 (2015). The dissent is incorrect in this regard. (Continued)

13

ATF is ineffectual, Appellants argue SB-707's regulatory prohibition on one's ability to "transport . . . into the State" or "manufacture, possess, sell, offer to sell, transfer, purchase, or receive a rapid fire trigger activator," SB-707, sec. 1, § 4-305.1(a), is tantamount to a direct appropriation of the personal property.

To date, the Supreme Court has recognized only two types of per se regulatory takings. First, in *Loretto v. Teleprompter Manhattan CATV Corp.*, the Supreme Court considered whether a New York law requiring landlords to permit cable television companies to install equipment on their properties violated the Takings clause. 458 U.S. 419 (1982). Though the cable boxes and lines landlords were required to allow to be installed did not take much space on the landlords' properties, the Court characterized them

---

Though a "per se" taking originally only applied to physical takings, the Supreme Court has held that regulatory takings, too, can be per se. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982); *see also Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992). For this reason, we refer herein to "classic" takings as physical takings, which are distinct from regulatory takings.

Per se regulatory takings have been recognized in only two limited instances -- *Loretto*, where the regulation required property owners to permit third parties to physically occupy their property, 458 U.S. 419, and *Lucas*, where the regulation rendered *real property* economically worthless, 505 U.S. 1003. As we explain below, the Supreme Court has left intact *Lucas'* distinction between real and personal property with regard to *regulatory* takings. *See Horne*, 135 S. Ct. at 2427. Thus, the per se regulatory taking in *Lucas* applies only to real property. And, as we further explain, the per se regulatory taking in *Loretto* is readily distinguishable because SB-707 does not require or permit third parties to take physical possession of the personal property.

Without recognizing the distinction between physical and regulatory takings, the dissent classifies the alleged taking here as a "classic" or *physical* taking. This, too, is incorrect, as SB-707 is (1) a regulation, and (2) does not require owners of the banned devices to physically turn them over to the Government. Therefore, SB-707 is not a classic, per se physical taking. And, because *Loretto and Lucas* are distinguishable, there is no framework under which we could conclude that it is a per se regulatory taking.

as a "minor but permanent physical occupation" of the property. *Id.* at 421. The Court concluded "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Id.* at 426. Thus, when a regulation authorizes a third party to physically take property, that regulation effects a per se regulatory taking.

Then, in *Lucas v. South Carolina Coastal Council*, the Court found a per se or total regulatory taking "where regulation denies all economically beneficial or productive use *of land*." 505 U.S. at 1015 (citing *Agins v. City of Tiburon*, 447 U.S. 255, 260 (1980)) (emphasis supplied). In explaining its reasoning for adopting this per se rule, the Court provided some insight into the distinctions between takings of real property and personal property:

> It seems to us that the property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers; as long recognized, some values are enjoyed under an implied limitation and must yield to the police power. *And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless* (at least if the property's only economically productive use is sale or manufacture for sale). In the case of land, however, we think the notion . . . that title is somehow held subject to the "implied limitation" that the State may subsequently eliminate all economically valuable use is inconsistent with the historical compact recorded in the Takings Clause that has become part of our constitutional culture.

*Id*. at 1027–28 (emphasis supplied) (internal quotation marks, citations, and alterations omitted).

Against this backdrop of cases, we held in *Holliday Amusement Co. of Charleston, Inc. v. South Carolina* that a South Carolina ban on the possession or sale of certain gambling machines was not a taking. 493 F.3d 404, 410–11 (4th Cir. 2007). There, the appellant previously had lawfully acquired video poker machines which it distributed for profit. *See id.* at 406. When South Carolina passed a law making possession of the machines unlawful and subjecting them to forfeiture, the appellant filed suit claiming a regulatory taking and requesting just compensation. *See id.* We concluded, "We believe that Supreme Court case law makes clear that gambling regulations like Act 125 per se do not constitute takings." *Id.* at 411 n.2. We came to this conclusion relying on *Andrus v. Allard*, 444 U.S. 51, 65 (1979), in which the Supreme Court held "government regulation—by definition—involves the adjustment of rights for the public good," and *Lucas*, where the Court noted "in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware that new regulation might even render his property economically worthless," 505 U.S. at 1027–28. Because gambling is "an area in which the state traditionally enjoys wide latitude to regulate activity minutely or to outlaw it completely," *Holliday*, 493 F.3d at 410, we held the appellant "was well aware that the South Carolina legislature might not continue to look favorably upon it. The fact that this possibility came to pass does not yield him a constitutional claim," *id.* at 411.

Though Appellee argues *Holliday* squarely forecloses Appellants' Takings claim, Appellants argue *Holliday* did not survive the Supreme Court's 2015 decision in *Horne v. Dept. of Agriculture,* 135 S. Ct. 2419 (2015). According to Appellants, *Horne* makes clear

that both types of per se regulatory takings apply equally to real property and personal property. Appellants' contention plainly fails.

In *Horne*, the Supreme Court did hold that the first type of per se regulatory takings identified in *Loretto* -- direct appropriation -- applies to personal property. *See Horne v. Dept. of Agriculture*, 135 S. Ct. 2419, 2425–27 (2015) (explaining the "Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home," because "[n]othing in this history suggests that personal property was any less protected against *physical appropriation* than real property") (emphasis supplied)). *Lucas*, which established the second type, however, was about purely *regulatory* takings, not direct appropriations authorized by regulation. *Id.* at 2427. Thus, *Horne* distinguished *Lucas*: "[w]hatever *Lucas* had to say about reasonable expectations with regard to regulations, people still do not expect their property, real or personal, to be *actually occupied or taken away*." *Id.* (emphasis supplied).

Appellants overlook this distinction and how it applies in this case. SB-707 does not require owners of rapid fire trigger activators to turn them over to the Government or to a third party. Regardless of whether we would today decide *Holliday* -- which required *forfeiture* of the gambling machines -- the same way, the *Horne* Court expressly preserved the reasoning behind *Holliday*'s conclusion as it appears in *Lucas* and *Andrus*. Though SB-707 may make the personal property economically worthless, owners are "aware of th[at] possibility" in areas where the State has a "traditionally high degree of control." *Lucas*, 505 U.S. at 1027–28. We can think of few types of personal property that are more heavily regulated than the types of devices that are prohibited by SB-707. And,

17

"government regulation—by definition—involves the adjustment of rights for the public good." *Andrus*, 444 U.S. at 65.

Thus, we agree with the district court that Appellants do not state a claim that SB-707 violates the Takings Clause.

D.

Maryland Declaration of Rights

Finally, we address Appellants' claim that the district court improperly determined SB-707 does not violate Article 24 of the Maryland Declaration of Rights.

"Together, Maryland's Declaration of Rights and Constitution prohibit the retrospective reach of statutes that would have the effect of abrogating vested rights." *Muskin v. State Dept. of Assessments and Taxation,* 30 A.3d 962, 968 (Md. 2011). "If a retrospectively-applied statute is found to abrogate vested rights or takes property without just compensation, it is irrelevant whether the reason for enacting the statute, its goals, or its regulatory scheme is rational." *Id.* at 969 (internal quotation marks omitted).

The first step in analyzing whether SB-707 violates Maryland's Constitutional provisions is determining whether the law operates retrospectively. Importantly, though Appellants have challenged the district court's holding that SB-707 does not abrogate vested rights, they have not challenged the district court's ruling that the statute is not retrospective, thereby waiving the issue. *See Roe v. United States DOD*, 947 F.3d 207, 219 (4th Cir. 2020) (citation omitted) ("Issues that [the appellant] failed to raise in his opening brief are waived."). Because a statute must be retrospective to violate the Maryland Declaration of Rights, we affirm the district court's decision on this issue.

18

In any event, though Maryland has not identified a "bright line rule" for determining what constitutes retrospective application, the Maryland Court of Appeals has held a retrospective application "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *John Deere Const. & Forestry Co. v. Reliable Tractor, Inc.*, 957 A.2d 595, 599 (Md. 2008) (internal quotation marks omitted). And the Maryland Court of Appeals "adopted the [United States] Supreme Court's *Landgraf* factors analysis for retrospectivity that evaluates 'fair notice, reasonable reliance, and settled expectations' to determine 'the nature and extent of the change in law and the degree of connection between the operation of the new rule and a relevant past event.'" *Muskin*, 30 A.3d at 970 (quoting *Landgraf v. USI Film Prods.,* 511 U.S. 244, 270 (1994)). The district court held that SB-707 does not operate retrospectively, and we agree. SB-707 does not alter the rights Appellants possessed when they purchased their rapid fire trigger activators, nor does it impose new liability back to the date of purchase. Instead, Appellants had fair notice of the change in law -- SB-707 was passed six months before it first went into effect.

IV.

For the foregoing reasons, the decision of the district court is

*AFFIRMED*.

19

RICHARDSON, Circuit Judge, concurring in the judgment in part and dissenting in part:

In 2018, Maryland banned "rapid fire trigger activators"—bump stocks, burst triggers, and similar devices that permit a gun to fire faster. Unlike most bans, the Maryland law fails to grandfather-in existing property owners. For them, the real-world consequences of Maryland's ban are manifest: owners must destroy their devices, abandon them, surrender them, or send them out of state. The principal question in this appeal is whether Maryland's ban runs afoul of the Fifth Amendment because it takes "private property for public use, without just compensation." U.S. CONST. amend. V.

In my view, it does. A "classic" taking occurs not only when "government directly appropriates private property," but also when it "ousts the owner" of possession—as Maryland does here. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). The traditional "[p]roperty rights in a physical thing" are "to possess, use and dispose of it." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 417, 435 (1982) (quoting *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945)). And Maryland's ban expressly eliminates *each* of these rights—it "does not simply take a single 'strand' from the 'bundle,'" rather "it chops through" and "tak[es] a slice of every strand." *Id.* When this type of taking occurs, an ousted owner is *per se* entitled to just compensation under the Fifth Amendment—period. *Horne v. Department of Agriculture*, 135 S. Ct. 2419, 2426 (2015). So I would vacate the district court's dismissal of Plaintiffs' takings claims and remand the case for further proceedings.

20

## I.    Facts

### A.    The Maryland ban

On October 1, 2018, private ownership of "rapid fire trigger activators" in Maryland became illegal. A "rapid fire trigger activator" is "any device . . . constructed so that, when installed in or attached to a firearm, the rate at which the trigger is activated increases; or the rate of fire increases." Md. Code § 4-301(M)(1). The term "rapid fire trigger activator" includes "a bump stock, trigger crank, hellfire trigger, binary trigger system, burst trigger system, or a copy or a similar device, regardless of the producer or manufacturer." § 4-301(M)(2).[1] On pain of fine or up to three years in prison, private citizens may not "manufacture, possess, sell, offer to sell, transfer, purchase, or receive a rapid fire trigger activator." § 4-305.1(a). Nor may they "transport" these devices into the state. § 4-306(a).

One provision of Maryland law purports to permit owners to hold on to their banned devices so long as they:

---

[1] Maryland law defines each of these enumerated mechanisms:
- A "bump stock" "increases the rate of fire of the firearm by using energy from the recoil of the firearm to generate a reciprocating action that facilitates repeated activation of the trigger." § 4-301(F).
- A "trigger crank" "repeatedly activates the trigger of the firearm through the use of a crank, a lever, or any other part that is turned in a circular motion." § 4-301(N).
- A "hellfire trigger" "disengages the trigger return spring when the trigger is pulled." § 4-301(K).
- A "binary trigger system" "fires [a gun] both when the trigger is pulled and on release of the trigger." § 4-301(E).
- A "burst trigger system" "allows the firearm to discharge two or more shots with a single pull of the trigger by altering the trigger reset." § 4-301(G).

Semiautomatic "replacement triggers" that merely "improve[] performance and functionality over the stock trigger" do not fall within the ban. § 4-301(M)(3).

21

(1) possessed the rapid fire trigger activator before October 1, 2018; (2) applied to the [federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")] before October 1, 2018, for authorization to possess a rapid fire trigger activator; (3) received authorization to possess a rapid fire trigger activator from the [ATF] before October 1, 2019; *and* (4) [are] in compliance with all federal requirements for possession of a rapid fire trigger activator.

§ 4-305.1(b) (emphasis added). But—whether by design or mistake—this grandfather clause is illusory. The ATF, a federal agency, lacks the authority to assess applications for the State of Maryland. *See* Bureau of Alcohol, Tobacco, Firearms & Explosives Special Advisory, *Maryland Law Restricting "Rapid Fire Trigger Activators"* (Apr. 24, 2018). So the agency rebuffed all applications and returned any requests to the applicant without action. *See id.*

### B.    The proceedings below

Maryland Shall Issue ("MSI") and four of its members filed this putative class action in the District of Maryland. MSI, a Maryland nonprofit corporation, seeks to "preserv[e] and advance[] gun owners' rights in Maryland." J.A. 11. According to MSI, its members possess "rapid fire trigger activators which are effectively and totally banned" by Maryland law. J.A. 12. The four named MSI members similarly claim to "own[] one or more of the 'rapid fire trigger activators' newly banned by [Maryland]." *Id.* And they assert the ban "dispossesses [them] of their property" without compensation. J.A. 14.

Plaintiffs assert two related takings claims. First, Plaintiffs contend the Maryland ban violates the Takings Clause of the U.S. Constitution. Second, they argue the ban is an

22

impermissible taking under the Maryland Declaration of Rights. The district court

disagreed and granted Maryland's motion to dismiss. *See* FED. R. CIV. P. 12(b)(6).[2]

Plaintiffs timely appealed. With all claims dismissed below, this appeal properly

lays before us. *See* 28 U.S.C. § 1291.

## II.    Discussion

We review the district court's dismissals de novo. At the 12(b)(6) stage, we accept

all well-pleaded facts as true and draw all reasonable inferences in favor of Plaintiffs. *Ray*

*v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020). When viewed in this light, Plaintiffs' claims

survive if they provide a plausible legal basis for relief. *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).

### A.    Standing to assert takings claims

As a judge on a court of limited jurisdiction, I first must confirm our power to hear

this appeal. *See General Technology Applications, Inc. v. Exro Ltda*, 388 F.3d 114, 118

(4th Cir. 2004). Article III limits the federal "judicial Power" to "cases and controversies."

U.S. CONST. art. III, § 2. Beyond this limit, we lack subject-matter jurisdiction. "One

element of the case-or-controversy requirement" that all federal-court plaintiffs must

establish is standing. *Raines v. Byrd*, 521 U.S. 811, 818 (1997). And standing's

"irreducible constitutional minimum" has three components: "Plaintiffs must show that

they have (1) suffered an injury in fact, that is (2) fairly traceable to the challenged conduct

---

[2] Plaintiffs also claimed the ban is unconstitutionally vague. The district court dismissed this claim for lack of subject-matter jurisdiction. And I agree that Plaintiffs lack standing to bring this claim.

23

of the defendant, and (3) likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "[A]t least one plaintiff must have standing to sue" on each claim asserted. *Department of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019).

I agree with the majority's (implicit) determination that individual Plaintiffs have standing to bring their takings claims. In *Andrus v. Allard*, the Supreme Court considered whether owners of protected bird products had standing to claim that a federal ban on selling their products amounted to a taking without compensation. 444 U.S. 51, 54–55 (1979). "Because the regulations [the owners] challenge[d] restrict[ed] their ability to dispose of their property," the Court reasoned, they had "a personal, concrete, live interest in the controversy." *Id.* at 64 n.21. Here, Maryland law not only eliminates Plaintiffs' property right to "sell [or] transfer" their devices, but also to "possess" or "transport" them. §§ 4-305.1(a), 4-306(a). So, as in *Andrus*, the individual Plaintiffs suffer a concrete injury from Maryland's ban, and a favorable judicial decision promises relief.[3]

---

[3] Maryland urges this appeal is moot because federal regulations now ban bump stocks. *See* 27 C.F.R. § 478.11; *Guedes v. BATF*, 920 F.3d 1 (D.C. Cir. 2019). Thus, the state claims, the outcome of this case will have no practical effect on Plaintiffs. Not so.

Simply put, the federal regulations and Maryland ban are coextensive in neither time nor scope. First, this argument fails to consider the time between the Maryland ban and the federal ban. *See First English Evangelical Lutheran Church of Glendale v. Los Angeles County*, 482 U.S. 304, 320 (1987) (The government has a "duty to provide compensation for the period during which the taking was effective."). Second, even assuming later changes to federal law could moot a taking by operation of state law, Maryland's ban applies more broadly than its federal counterpart. *Compare* 27 C.F.R. § 478.11 (bump stocks) *with* § 4-301(M)(2) (trigger cranks, hellfire triggers, binary trigger systems, and more); *accord* Appellee Br. 17 n.4. Indeed, the ATF specifically excluded binary triggers from its regulations, *see* 83 Fed. Reg. 66534, but Maryland bans them. And Plaintiffs claim (Continued)

Because individual Plaintiffs have standing to assert their takings claims, I see no need to address MSI's associational standing on this issue. *See Department of Commerce*, 139 S. Ct. at 2565. Yet the majority does, and I find their analysis peculiar. Rather than identifying a plaintiff with standing to assert the takings claims, the majority instead chooses to discuss and reject one associational standing theory that fails. I fail to see the rhyme or reason for this approach here.

### B. Takings claims

Having confirmed our court's power to entertain Plaintiffs' takings claims, I now turn to the merits.

### 1. The Supreme Court's "classic" and "regulatory" takings jurisprudence

The Fifth Amendment's Takings Clause provides that private property shall not "be taken for public use, without just compensation." U.S. CONST. amend V. For the last century-and-a-quarter, this constitutional prohibition has bound the states as well as the federal government. *See Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226 (1897). As originally understood, "'the Takings Clause reached only a direct appropriation of property, or the functional equivalent of a practical ouster of the owner's possession.'" *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992)). Grounded in our history and constitutional tradition, the Supreme Court has called this historic form of government interference a

---

more than just their bump stocks were taken. *See* J.A. 12. So Plaintiffs retain a legally cognizable interest in the outcome, and their case remains live. *See Powell v. McCormack*, 395 U.S. 486, 496 (1969).

25

"classic taking." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005); *see Horne v. Department of Agriculture*, 135 S. Ct. 2419, 2425 (2015) (tracing classic takings back to the "principles of the Magna Carta").

Over time, the Supreme Court expanded the scope of the Takings Clause beyond the classic paradigm. In *Pennsylvania Coal Co. v. Mahon*, the Supreme Court endorsed an ad hoc factual inquiry to determine when "regulation goes too far" so as to be "recognized as a taking." 260 U.S. 393, 415 (1922). On one hand, the Court explained, "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the law." *Id.* at 413. But, at the same time, "a strong public desire to improve the public interest is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Id*. at 416. The proper balance between these two apparently contradictory principles, Justice Holmes said, "is a question of degree—and therefore cannot be disposed of by general propositions." *Id*.

*Mahon* laid the cornerstone for the "regulatory takings" doctrine that jurists apply today.[4] And despite Justice Holmes's suspicion of "general propositions" in the

---

[4] Unfortunately, this label creates a slight linguistic difficulty: "regulatory takings" need not arise from federal-registrar-type "regulations." As described below, the Supreme Court has used this label to refer to the nature of the government action, not the form of a legal edict. Accordingly, *regulations* have given rise to "classic takings." *See Horne*, 135 S. Ct. at 2428 (Department of Agriculture regulation was a classic taking). Similarly, *laws* or *other forms of government action* have resulted in "regulatory takings." *See Eastern Enterprises v. Apfel*, 524 U.S. 498, 529–37 (1999) (plurality) (federal statute gave rise to regulatory taking). Thus, the term "regulatory takings" is best understood as referring to a conceptual class of takings, rather than a taking caused by a "regulation." *Contra* Majority Op. 13–14 n.4.

26

regulatory-takings context, the Court has since identified "two guidelines" that channel this inquiry. *Murr*, 137 S. Ct. at 1937. First, a regulation that "denies all economically beneficial or productive use of land" is considered a "total regulatory taking" that generally requires compensation. *Lucas*, 505 U.S. at 1015. Second, *Mahon*'s "ad hoc, factual inquiry" has been distilled to three factors for consideration: the economic impact of a regulation, the regulation's interference with investment-backed expectations, and the character of the government action. S*ee Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978). Relatedly, the Court has identified two propositions that cut against finding a regulatory taking. A regulatory-takings claim generally fails if "the challenged limitations 'inhere . . . in the restrictions that background principles of the State's law of property and nuisance already placed on land ownership.'" *Murr*, 137 S. Ct. at 1943 (quoting *Lucas*, 505 U.S. at 1029). And, due to the state's "high degree of control over commercial dealings," the Court has suggested that personal property may be less protected than real property in the regulatory-takings context. *See Lucas*, 505 U.S. at 1027–28; *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d 404, 410–11 (4th Cir. 2007).

Yet, the "classic taking" retains a distinct identity in our Fifth Amendment jurisprudence. Indeed, the Supreme Court has repeatedly warned against confusing its inquiry for classic takings with the analysis for regulatory takings. *Horne*, 135 S. Ct. at 2428–29; *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323 (2002). Whatever the role of categorical rules in the "more recent" regulatory-takings inquiry, the classic taking, "old as the Republic[,] . . . involves the straightforward

27

application of *per se* rules." *Tahoe-Sierra Pres. Council*, 535 U.S. at 322. A classic taking always requires compensation—no matter how trivial the economic consequences. *Horne*, 135 S. Ct. at 2426; *Loretto*, 548 U.S. at 434–35. Even if we recognize different sets of expectations for personal and real property in the regulatory-takings context, *see Lucas*, 505 U.S. at 1027–28, they are treated the same in the classic framework, *Horne*, 135 S. Ct. at 2426–28. And although the state's police powers or background principles of property law may defeat a regulatory-takings claim, *see Lucas,* 505 U.S. at 1029, they will not affect a classic-takings claim, *Horne*, 135 S. Ct. at 2425, 2428; *Loretto*, 548 U.S. at 434–35.[5]

You might wonder how a singular constitutional clause can be imbibed with such disparate meanings. I might too. One meaning is rooted in the original understanding of a taking, *see Horne*, 135 S. Ct. at 2426–27; *compare* 1 William Blackstone Commentaries 134–36 (1st ed. 1765), the other is a newer doctrine shaped by the forward-march of government regulation during the twentieth century, *see Murr*, 137 S. Ct. at 1942. But students of the law are no stranger to parallel legal theories that spring from the same constitutional source. *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 34 (2001) (noting the Fourth Amendment shelters privacy interests "that existed when the Fourth Amendment

---

[5] This is not to say that "*per se*" rules either do not or cannot apply in the regulatory context. *Contra* Majority Op. 13 n.4. Indeed, the Supreme Court has at various times referred to *Lucas* as establishing either a "*per se*" or a "categorical" regulatory takings rule. *Compare Tahoe-Sierra Pres. Council*, 535 U.S. 302, 325 (describing *Lucas* as "a regulatory takings case that, nevertheless, applied a categorical rule"), *with Lingle*, 544 U.S. at 528 (suggesting that Lucas established a "*per se*" rule). But the *Lucas* rule, however it is characterized, has exceptions. *See Lucas*, 505 U.S. at 1029. Classic takings do not and so always require just compensation. *See Horne*, 135 S. Ct. at 2425.

was adopted" as well as contemporary "reasonable expectations of privacy"). In this respect, the Takings Clause is simply par for the course.[6]

But by applying distinct legal rules in the classic- and regulatory-takings contexts, the Supreme Court has concentrated considerable pressure on the threshold question of categorization. In this case, that pressure comes to a head. Plaintiffs argue Maryland's ban amounts to either a *per se* classic taking (*see Loretto/Horne*) or a total regulatory taking (*see Lucas*).[7] If Maryland's ban is a taking within the former framework, just compensation is required—no matter the state's interest. But if Maryland's ban is more aptly characterized as a total regulatory taking, then background principles of Maryland law likely defeat Plaintiffs' takings claim. *See* Majority Op. 15–17; *Holliday Amusement*, 493 F.3d at 410–11. *But see Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1136–39 (S.D. Cal. 2017), *aff'd*, 742 F. App'x 218 (9th Cir. 2018). This stark doctrinal divide requires

---

[6] Of course, this only highlights certain fundamental questions: How do we justify two parallel doctrines rising from a single source? Are parallel doctrines tenable? *See* Craig S. Lerner, *Justice Scalia's Eighth Amendment Jurisprudence: The Failure of Sake-of-Argument Originalism*, 42 HARV. J.L. & PUB. POL'Y 91 (2019) (discussing the breakdown of the Eighth Amendment compromise between evolving standards of decency and the original understanding of cruel and unusual punishment). Why do we think the judiciary is well-equipped to evaluate the reasonableness of investment or privacy expectations? *See* The Federalist No. 78, at 468–69 (Hamilton) (C. Rossiter ed., 1961) (discussing the independence of the judiciary from public opinion). And as our own decisions may in turn influence the public's expectations, where lies the line between deciding what the law is and what it should be? *See* Michael Abramowicz, *Constitutional Circularity*, 49 UCLA L. REV. 1, 60–63 (2001); *Lucas*, 505 U.S. at 1035–36 (Kennedy, J., concurring) (citing *Katz v. United States*, 389 U.S. 347 (1967)).

[7] Plaintiffs do not make an ad-hoc-regulatory-takings claim (*see Penn Central*).

confronting the deceptively difficult question of whether Maryland's ban falls within the scope of the classic-takings doctrine. I conclude it does.

### 2. The Maryland ban is a "classic taking"

We return to the text of the constitutional prohibition: "nor shall private property be taken for public use without just compensation." U.S. CONST. amend. V. As framed here, this case turns on what it means to "take" "property" in the classic context.[8]

The Supreme Court explains that "property," within the text of the Fifth Amendment, "denote[s] the group of rights inherent in the citizen's relation to [a] physical thing," as opposed to merely the physical thing itself. *United States v. Gen. Motors Corp.*, 323 U.S. 373, 377 (1945); *see also Eaton v. Boston, C. & M.R.R.*, 51 N.H. 504, 511 (1872) ("'[P]roperty,' although in common parlance frequently applied to a tract of land or chattel, in its legal signification 'means only the rights of the owner in relation to it.'") (quoting *Wynehamer v. The People*, 13 N.Y. 378, 433 (1856)); 1 Blackstone Commentaries 138 (Property "denotes a right" over a thing). The bedrock rights of property are "to possess, use and dispose" of an item. *Loretto v. Teleprompter Manhattan CATV Corp*, 458 U.S. 419, 435 (1982) (quoting *General Motors*, 323 U.S. at 378); *compare* 1 Blackstone Commentaries 134 ("use, enjoyment, and disposal"). And the government takes property in the classic sense when it eliminates each of these property rights. *See Loretto*, 458 U.S. at 435; *Eaton*, 51 N.H. at 511–12.

---

[8] The parties do contest the meaning of "public use." *See Kelo v. City of New London*, 545 U.S. 469, 484 (2005) (holding that the condemnation of property for private economic development is a "public use").

30

In *Loretto*, for instance, the Supreme Court considered whether a government-mandated physical occupation of real property by a third party was a taking. There, New York law required landlords to permit cable-television companies to install cable hookups on their rooftop. *Id.* at 421. After explaining that property rights in a physical thing are "the rights 'to possess, use and dispose of it,'" the Court reasoned that a permanent physical occupation is a *per se* taking *because* "it effectively destroys each of these rights." *Id*. at 435. First, the owner loses the right to possess the occupied space himself and has no power to exclude the occupier. *Id*. Second, the owner is denied any control over the use of the occupied property. *Id*. And last, even though the owner retains the right to dispose of the occupied space, that right is void of value since the property is occupied by another. *Id*. So the physical occupation is of a special character only *because*—to use the Supreme Court's metaphor—that occupation "chops through the 'bundle'" of property rights, rather than takes "a single 'strand.'" *Id.*; *see also YMCA v. United States*, 395 U.S. 85, 92 (1969) ("Ordinarily, of course, governmental occupation of private property deprives the private owner of his use of the property, and *it is this deprivation* for which the Constitution requires compensation.") (emphasis added).

Similarly, in *Horne*, the Supreme Court considered whether a Department of Agriculture regulation requiring raisin handlers to set aside a portion of their raisins for the government amounted to a classic taking. 135 S. Ct. at 2424. Although the raisins may remain on the premises of the handlers, a government committee dictated whether the set-aside raisins would be sold in noncompetitive markets or donated to charitable causes. *Id*. at 2424, 2428. Net proceeds—if any—would be distributed to the handler. *Id*. at 2424.

31

The court explained that the set-aside requirement "is a clear physical taking." *Id*. at 2428. And it reasoned that growers subject to the reserve requirement "thus lose the entire 'bundle' of property rights in the appropriated raisins—'the rights to possess, use and dispose of' them." *Id.* (quoting *Loretto*, 458 U.S. at 435). Therefore, the Court explained that "[t]he Government's 'actual taking of possession and control' of the reserve raisins gives rise to a taking." *Id*. (quoting *Loretto*, 458 U.S. at 435).

In contrast, consider *Andrus v. Allard*, when the Supreme Court analyzed whether the federal government took property from commercial dealers when it prohibited transactions in protected bird feathers and other items. 444 U.S. at 55. There, the Court acknowledged the "significant restriction [] imposed on one means of disposing of the artifacts"—a prohibition on their sale. *Id*. at 66. But, it reasoned, "[a]t least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Id*. at 66–67 (citations omitted). And "[i]n this case, it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds." *Id*. at 68. So the Court applied a regulatory-takings lens and held that the federal restriction on sales did not amount to a taking.[9]

---

[9] Similarly, the Supreme Court requires a "total" regulatory-taking analysis when an owner loses a single property right that zeros out the economic value of his holding while the rest of his property rights remain intact. In *Lucas v. South Carolina Coastal Council*, the Court assessed whether a South Carolina ban on coastal-zone construction amounted to a taking. 505 U.S. at 1007. There, the state took Lucas's right to construct "occupiable improvements," like single-family homes, on his land. *Id*. at 1008–09. Although taking this right "eliminated all economically viable use of his land," *id.* at 1021, (Continued)

*Loretto*, *Horne*, and *Andrus* highlight key distinctions that determine the applicability of either the classic or the regulatory framework. In *Loretto*, government action "effectively destroyed" the owner's core property rights to possess and use his property, and it impaired the owner's right to dispose of his property. 458 U.S. at 421. And in *Horne*, the government's reserve requirement similarly eliminated the handler's property rights to possess, use, and dispose. *See* 135 S. Ct. at 2427. Accordingly, the Court applied the classic takings framework in *Loretto* and *Horne*. But in *Andrus*, the owner retained the rights to possess, transport, and donate his property, losing only a single property right—the right to sell. 444 U.S. at 68; *see also Lucas*, 505 U.S. at 1009. So the Court used a regulatory framework. Together, these cases teach that when government action cuts across a broad swath of property rights, the classic framework applies. (For this reason, both physical appropriations and ousters of possession are classic takings.) But where only a single property right is taken or impaired—such as a use or sale regulation— the regulatory-takings framework provides the proper mode of analysis.

With these distinctions in mind, I find the classic-takings framework applies to Maryland's ban. That ban *expressly* eliminates the current owners' property rights to possess, transport, donate, devise, transfer, or sell their devices. §§ 4-305.1(a), 4-306(a).

---

Lucas retained the full bundle of remaining property rights. Lucas continued to own and possess the land, and he could sell it or build other structures on it. *See id.* at 1009 n.2; *see also id.* at 1044 (Blackmun, J., dissenting) ("Petitioner can [exclude, alienate,] picnic, swim, camp in a tent, or live on the property in a movable trailer."). Because only a single property right was taken, *Lucas* fell within the regulatory-takings framework. And the Court set out a "total" regulatory-takings doctrine for the South Carolina Supreme Court to apply on remand. *See id.* at 1027–32.

33

Not only does this list destroy all the rights the Supreme Court found crucial in *Andrus*, but it goes beyond even those rights "effectively destroyed" in *Loretto* and *Horne*. The *Loretto* plaintiff could at least sell the occupied property—even if that right was void of value. And the *Horne* raisin handlers retained a contingent interest in the profits from the sales of the set-aside raisins. But here, Plaintiffs are prohibited not just from "sell[ing]" their property, but from even "offer[ing] to sell" their devices or "transfer[ing]" them, such as by donation or devise. §§ 4-305.1(a). So the law is a far cry from the destruction of a single strand of the owner's property—it is a blunt chop through the bundle of rights that gives rise to a classic taking.

Moreover, the physical consequences of the enumerated list—although obvious—make the classic nature of this taking clear. Surely, the government must compensate owners for their personal property if it physically dispossesses owners. *See Horne*, 135 S. Ct. at 2428. But Maryland instead requires owners to physically dispossess themselves—or face imprisonment.[10] The dispossession mandate leaves the owner with a finite list of tangible options to effect dispossession of their rapid fire trigger activators: destroy them, trash them, abandon them, or surrender them. So a ban on possession is not just "'the functional equivalent of a practical ouster of the owner's possession,' like the permanent flooding of property." *Murr*, 137 S. Ct. at 1942 (internal citations omitted). A possession ban is an *actual* ouster. *See Oust*, Black's Law Dictionary (11th ed. 2019) ("To put out of

---

[10] *Cf.* Richard A. Epstein, Takings: Private Property and the Power of Eminent Domain 66 (1985) ("That the government has not taken physical possession of the land is neither here nor there. It clearly will enter the land by force" if its edict is "not respected by the parties who are subject to it.").

34

possession."); *Oust*, 7 Oxford English Dictionary 240 (2d ed. 1989) ("To put out of possession, eject, dispossess, disseise."). In other words, the possession ban does not make property ownership uneconomical or undesirable, as in a regulatory taking. It actually and physically defeats one's property rights—a classic taking.

Notably, the Maryland ban lacks the features that have traditionally prevented firearms-related regulations from being considered classic takings—namely use restrictions or registration options for existing owners. *See* Note, *The Public Use Test: Would a Ban on the Possession of Firearms Require Just Compensation*, 49 LAW & CONTEMP. PROBS. 223, 246 (1986) (discussing how regulations are typically drawn to avoid outright takings or absolute bans on possession). For example, in *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General of New Jersey*, the Third Circuit considered whether New Jersey's partial ban on the possession of magazines that held greater than ten rounds of ammunition amounted to a taking. 910 F.3d 106 (3d Cir. 2018). There, the court reasoned that the *per se* framework did not apply "because owners have the option to transfer or sell their [magazines] to an individual or entity who can lawfully possess [them], modify their [magazines] to accept fewer than ten rounds, or register" the magazines. *Id.* Here, Plaintiffs have no such options. Although the Maryland ban purports to allow for registration of rapid fire trigger activators with the ATF, that provision never

took effect. *See* Bureau of Alcohol, Tobacco, Firearms & Explosives Special Advisory, *Maryland Law Restricting "Rapid Fire Trigger Activators"* (Apr. 24, 2018).[11]

For these reasons, I would find that Plaintiffs' factual allegations are sufficient to show that Maryland's ban is a classic taking. So I would allow Plaintiffs' Fifth Amendment claim to proceed.[12]

According to the majority, the classic line of cases is simply inapplicable. In their view, the ban "does not require owners of rapid fire trigger activators to turn them over to the Government or to a third party." Majority Op. 17. I do not find this distinction persuasive, and neither has the Supreme Court. Property need not be turned over *to the government* to effect a classic taking. *See Loretto,* 458 U.S. at 433 n.9; *cf. Kelo*, 545 U.S.

_____

[11] Unlike the New Jersey case, in *Duncan v. Becerra*, a federal district court found that a more restrictive California magazine regulation was a taking. 265 F. Supp. 3d 1106, 1137 (S.D. Cal. 2017), *aff'd*, 742 F. App'x 218 (9th Cir. 2018). In *Duncan*, the California law, also banning magazines holding more than ten rounds, "provid[ed] three options for dispossession." First, an owner may "remove the large-capacity magazine from the State." *Id*. at 1110 (citation omitted). Second, one may "sell the large-capacity magazine to a licensed firearm dealer." *Id.* (citation omitted). And third, a person may "surrender the large-capacity magazine to a law enforcement agency for destruction." *Id.* (citation omitted). Although California provided three options for disposal, the court emphasized that the regulation deprived owners of "not just use of their property, but of *possession*, one of the most essential sticks in the bundle of property rights." *Id.* at 1138 (emphasis in original). So it found a taking—although under a novel "hybrid takings" theory. *See id.* Here, the Maryland law goes even further: it requires dispossession *without* the possibility of sale.

[12] For the same reasons, I would allow Plaintiffs' state law takings claim to proceed. Article 24 of the Maryland Declaration of Rights provides "That no man ought to be . . . deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." The Maryland Court of Appeals has held that, at a minimum, Article 24 provides the same protections for property as the Fifth Amendment. *See, e.g.*, *Raynor v. Maryland Department of Health & Mental Hygiene*, 110 Md. App. 165, 185 (1996).

36

at 477 ("[A] State may transfer property from one private party to another."). Indeed, property need not physically be turned over to anyone at all—not even a "third party"—for a classic taking to arise. For instance, in *Pumpelly v. Green Bay & Mississippi Canal Co.*, Wisconsin argued that property was not *taken* by the state when an owner's land was flooded after the construction of a dam. 80 U.S. 166, 178 (1871).[13] In response, the Supreme Court explained:

> It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government . . . it shall be held that if the government refrains from the absolute conversion of real property . . . it can, in effect, subject it to total destruction without making any compensation, because in the narrowest sense of that word, it is not *taken*.

*Id.* at 177–78 (emphasis in original).[14] So *Pumpelly* was a taking because the owners' property rights were *destroyed*, not because their rights were *transferred* to another—indeed, no transfer occurred at all. *See id.* at 174, 177–80; *see also Murr*, 137 S. Ct. at 1942 (noting that "the permanent flooding of property" is the "functional equivalent of a practical ouster of the owner's possession" and thus a classic taking). So too here.

---

[13] "The defendant's lands have not been *taken or appropriated*. They are only affected by the overflow occasioned by raising the water in Lake Winnebago. Whatever may be the extent of this injury, it is remote and consequential and without remedy." *Pumpelly*, 80 U.S. at 174 (argument of the appellee) (emphasis in original).

[14] Although *Pumpelly* was a pre-incorporation case that arose from the Takings Clause of the Wisconsin Constitution, the Court noted that the state and federal provisions were "almost identical in language." *Id.* at 177–78. And *Pumpelly* has continued to serve as an important precedent for modern takings claims under the federal constitution. *See, e.g.*, *Loretto*, 458 U.S. at 433 n.9; *First English*, 482 U.S. at 316–17.

Additionally, the majority says that *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d 404 (4th Cir. 2007), decides this case. *Holliday*, which "required *forfeiture* of [] gambling machines," Majority Op. 17, may indeed explain the failure of Plaintiffs' claim under *Lucas*' "total" regulatory-takings doctrine. But it has nothing to say about the merits of Plaintiffs' classic-takings claim under *Loretto* and *Horne*. As our Court explained in *Holliday*, those plaintiffs proceeded under a regulatory-takings theory, not a classic-takings theory. *See id.* at 407, 410, 411 n.2.[15] And as discussed above, regulatory-takings precedents are distinct from classic-takings precedents. *See Horne*, 135 S. Ct. at 2429; *Tahoe-Sierra Pres. Council*, 535 U.S. at 323. Indeed, the *Holliday* court denied compensation under a regulatory-takings framework based on South Carolina's traditionally high degree of control over gambling activities. *See Holliday Amusement*, 493 F.3d at 410–11. But as *Horne* makes clear, background principles of state law have no place in the classic-takings analysis—the Government has a *per se* duty "to pay just compensation when it takes your car, just as when it takes your home." 135 S. Ct. at 2426.[16]

---

[15] I find it unsurprising that plaintiffs in *Holliday Amusements* did not make this argument. Before the Supreme Court's decision in *Horne*, many courts and commentators believed different *per se* rules applied for personal and real property. *See generally Horne v. Department of Agriculture*, 750 F.3d 1128, 1140 (9th Cir. 2014). But as the Supreme Court has since made clear: "Nothing in the text or history of the Takings Clause, or our precedents, suggests that the rule is any different when it comes to appropriation of personal property." *Horne*, 135 S. Ct. at 2426; *see also James v. Campbell*, 104 U.S. 356, 358 (1882) (discussing the taking of patents).

[16] For the same reasons, the cases cited in Maryland's brief on this issue are inapposite. *Mugler v. Kansas*, for instance, was a regulatory-takings case involving a prohibition on the use of land for the manufacture and sale of alcoholic beverages; it in no way ousted the owners from their land. 8 S. Ct. 273, 279 (1887) (explaining "the owner is (Continued)

On the other hand, the district court seems to suggest that the classic framework does not apply because device owners may retain some property interests. *See* J.A. 246 n.8; *Horne*, 135 S. Ct. at 2437 (Sotomayor, J., dissenting) ("[E]ach and every property right must be destroyed by governmental action before that action can be said to have effected a *per se* taking."). In this view, if "even one property right" remains, the regulatory-takings framework provides the appropriate analysis. *Id*. at 2438 (Sotomayor, J., dissenting).

Assuming the ban left some ability to transfer the devices out of state, any such rights would not defeat the classic-takings analysis. First, it is simply incorrect that the government must destroy every stick in the bundle of property rights to effect a taking. As described above, in *Loretto*, the owner retained the right to sell or transfer the occupied property. 458 U.S. at 437. The court still applied a *per se* framework. *See also Horne*, 135 S. Ct. at 2428.[17]

---

in nowise *deprived* of his property") (emphasis in original); *see also Lucas*, 505 U.S. at 1022 (describing *Mugler* as one of the Court's "early attempt[s]" to explain why the government may "affect property values by regulation without incurring an obligation to compensate") (citing *Penn Central*, 438 U.S. at 125).

[17] *Cf. Kaiser Aetna v. United States*, 444 U.S. 164, 165–66 (1979). In *Kaiser Aetna*, the Supreme Court considered whether the government "took" property within the meaning of the Fifth Amendment when it required owners to afford public access to a marina created when the owners connected a private pond to a Hawaiian bay. The marina proprietors retained their ownership of the marina and could continue to charge their customers an annual $72 fee. *See id*. at 179–80. And they similarly retained the right to sell, transfer, or devise their property. *See id*. But, by requiring public access, the owners lost the property right to exclude others. Homing in on the loss of this right to exclude, the Supreme Court held "that the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation." *Id*. (footnote and citations omitted). So it found just compensation to be required.

Second, the statute unambiguously destroys Plaintiffs' ability to possess, use, or transfer property in the state where they reside. Never before have we required individuals to leave a jurisdiction to enjoy constitutional protections. *Cf. Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (explaining that a locality's First Amendment "time, place, or manner restrictions" must leave open "ample alternative channels"). And we should not do so today. The incorporated provisions of the Bill of Rights limit the powers of the several states, "necessarily taki[ng] certain policy choices off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008). And incorporation would be hollow indeed if it provided no protection from State power so long as one can go elsewhere to exercise his "rights." *See McDonald v. Chicago*, 561 U.S. 742, 790 (2010) ("Incorporation always restricts experimentation and local variations."). The Fifth Amendment prohibits uncompensated takings; it does not require flight to avoid them.

\*       \*       \*

As Justice Holmes noted almost a century ago, "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Mahon,* 260 U.S. at 416. And as Alexander Hamilton recognized, "one great obj. of Govt. is personal protection and security of Property." 1 Records of the Federal Convention of 1787, at 302 (Max Farrand ed., 1911); *see also* John Locke, *Second Treatise of Government* 62 (Blackwell ed., 1946) (describing the "great and chief end" of government as "the preservation of . . . property"). Indeed, constitutional restraints on the government's power over private property are deeply rooted in our history, and they have been integral to the preservation of personal liberty and

40

improved human condition over time.  *See generally* Douglass C. North & Barry R. Weingast, *Constitutions and Commitment: The Evolution of Institutions Governing Public Choice in Seventeenth-Century England*, 44 J. ECON. HIST. 803 (1989).

I do not doubt the sincerity of the Maryland legislature passing this ban.  But in my view, it requires paying just compensation.  By banning "rapid fire trigger activators" without exception, Maryland law destroys the panoply of property rights that private owners previously enjoyed—including possession, use, and devise.  This amounts to a classic taking of private property under the Fifth Amendment, so I would allow this case to proceed.